Argued at Pendleton May 22; affirmed June 7, 1932.

STATE *v.* SULLIVAN

(11 P. (2d) 1054)

*R. J. Kitchen,* of La Grande, for appellant.

*Carl G. Helm,* District Attorney, of La Grande, for the State.

BROWN, J. The defendant has appealed from a judgment convicting him of the crime of murder in the second degree. The principal facts in the cause surrounding the alleged slaying and death of the victim are substantially as follows:

Homer Bidwell was a farmer who resided upon, and cultivated, his lands situate near North Powder in Union county, Oregon. About 5:30 o'clock on the evening of June 27, 1931, the horses that he had used that day in plowing his field were found standing at the gate of the Bidwell home with tugs and lines dragging. Mrs. Bidwell, thinking that her husband had sustained an accidental injury, took the family car and set out to find him. Following the sagebrush-bordered road which led to the field, she found her husband lying in one of the tracks of the road at a point about 300 yards from the house, with his face upturned. In the belief that the horses had run away and injured him, she removed the blood from his nose and mouth and immediately had him taken to Hot Lake Sanitorium 15 miles away, where he was pronounced dead. In the preparation of the body for burial, a slight abrasion was observed under the left eye. X-ray pictures were taken and a bullet located in the head. A post-mortem examination revealed that the bullet, a 25 caliber, had passed through his left eye, followed a backward course, and lodged in the back of his head on the right side. The question then arose: Who killed Homer Bidwell?

The testimony in the case shows that, in July, 1930, defendant Sullivan and his wife started on an automobile journey from Portland, Oregon, to their former home in Missouri, with the idea of doing a little work

along the way. When they reached the Bidwell ranch near North Powder, Homer Bidwell hired Sullivan, who was traveling under the name of Sylvester Marler, to help him in putting up his hay crop, and Sullivan's wife agreed to help Mrs. Bidwell with the cooking and dishwashing in payment for her board and room. Mrs. Bidwell testified that Sullivan and his wife arrived at their home about July 4, 1930, and remained until August 16th following, when Sullivan decided to proceed on his way East. Mrs. Sullivan desired to remain in Oregon. Argument ensued, and, concerning this difficulty, Mrs. Bidwell testified:

"He (Sullivan) came to the house and told her (his wife) to get ready; that they were going to Missouri. * * * She says: 'I don't want to go to Missouri, and I am not going there.' And he says: 'Yes, you are going, or I'll kill you and take you like a stuck hog.' She says: 'Well, I don't want to go.' And he says, 'Well, you are going.' And he went out there to get the car ready, and she came to me— * * *."

She testified that defendant's wife told her that she lived in fear of her husband, and that it was her intention to leave him. That afternoon Mr. and Mrs. Bidwell drove to Baker, as did Sullivan and his wife. When the Sullivans reached Baker, Mrs. Sullivan alighted from the automobile and went into a store, leaving her husband sitting in the automobile. After waiting in vain for her return he entered upon a vigilant hunt, without success. He then returned to the Bidwell ranch and asked Mrs. Bidwell where his wife was, and she answered that she didn't know. He next drove to the home of his wife's uncle in Portland, to ascertain whether she had gone there. Failing to learn anything from the uncle, he again returned to the Bid-

well home, accosted Mr. Bidwell and asked him where his wife's clothing was, and he answered that he did not know. Mrs. Bidwell's testimony continues.

" 'Well,' he says, 'I got her clothes that was in the bureau drawer.' * * * Homer says: * * * 'You get out of here.' He says, 'Well,' * * * and he (defendant) wanted to know, he says, 'Did you ever hear her say where she was going?' Homer says: 'I heard her say something that she was liable to go to her father up in Canada.' 'Well,' he says, 'I will kill her and her father both.' * * * He came back other times. * * * He was angry, and wanted Homer to call me out of bed * * *. He (defendant) was swearing, and swore at both of us."

She testified that defendant came to their home early on the Monday morning after his wife disappeared; that—

"We were just getting up. * * * It was just daylight Monday morning,—must have been between four and five o'clock, and he was trying at the door to get in, and Homer ran out, and he began to cry and take on terribly about his wife, and said he wanted her. * * * He claimed he had been to Portland and back, and that he had gone down there thinking that she was at her uncle's, and he had come back and was there at five o'clock. And I was getting breakfast, and he came up beside me when I was standing at the stove, and he says: 'I am hurt. I am hurt. I am hurt. * * * I know I am to blame for everything. * * * I had no business to treat her the way I did.' * * * He says: 'Will you tell me where she is?' I says, 'No, I don't know where she is, and I wouldn't tell you if I knew.' That is what made him so mad."

She testified that he came at still other times. She further testified that some unknown person was watching around their home after night on four or five different occasions; that they heard someone around the

place several times, but could never find anybody; that, during this time, it was the usual custom of her husband and herself for one of them always to remain at home to watch the premises, but that, contrary to custom, on Saturday, August 30, 1930, both her husband and herself went to Baker and left the place alone, and, upon returning home, found that the shells had been removed from their shotgun and other shotgun shells had likewise been taken, and that a twenty-five-dollar suitcase, a telescope and a blanket were also missing from their home.

Walter Manning testified that he' had worked at the Bidwell ranch for three years. He testified that he heard a conversation between the defendant and Homer Bidwell on the night of August 16, 1930, in which the defendant asked Mr. Bidwell where he supposed his wife was; that Mr. Bidwell told him "he thought maybe she might have went to Canada to her folks; * *. * and then I heard him (defendant) say he was going to go and kill somebody. * * * I didn't get the name distinctly." Referring to a conversation between himself and the defendant, Manning testified that the defendant "said he had written back East to his aunt for money; that he was going back there; and he says: 'Next year I will come back and get even.' He says: 'They have the best of it now, but I will have the best of it after I get back.' "

We have hereinbefore made reference to some property that had been taken from the Bidwell home. Manning testified to the following additional circumstance which tends to show motive or desire on the part of the defendant to injure the deceased:

"I was working out in the field,—oh, about a hundred yards from the house, and I saw somebody walking to the house, * * * and I saw it was Mr.

Marler (defendant). I didn't see him go in the house. I didn't pay much attention to it. I didn't know Bidwells had left, but they had previously said they were going * * *. We were hauling bundles * * *. In about twenty or thirty minutes we saw him (defendant) leave,—leave the house,—I guess in about twenty or thirty minutes, from fifteen to twenty, we saw smoke coming out of the house. * * * Before we saw the smoke we could smell rags burning, and then afterwards we saw smoke coming out of the door of the house, and we ran up there as fast as we could, and I went in, and when I first went in I turned the hydrant and got a bucket of water, and I ran back, and I found my bed on fire, and the fire blazing up the wall. I threw the water on the blaze, and rolled up the bed the best I could and pulled it outside, and finished putting the fire out.''

This fire occurred two weeks after Sullivan and his wife left the Bidwell ranch.

J. E. Schofield, an unfriendly neighbor of the Bidwell's, testified that the defendant had told him he thought the Bidwells knew where defendant's wife was and would not tell him. This witness testified that on one particular occasion he had a conversation with the defendant concerning Mr. Bidwell, which he related as follows:

''He said he stopped there and saw Bidwell out in the field, and he went over and was talking to him, and he said the old son of a B was scared to death. He said: 'I told him that I would get him,' something to that effect. I think that is the words he used. He said: 'I told him I would get him.'

''Q. And that he appeared to be scared to death?
''A. Yes.''

What we believe to refer to the same circumstance is thus related by Mrs. Bidwell:

''I was in the house, and Homer had been across the creek about a hundred yards from the house * * *

raking, and all at once I noticed him coming to the barn with the horses on the trot with the rake, and he came up and tied the team just below the barn to the fence, and he came running to the house, and he was as white as a sheet. When he came in he says, 'Sylvester'—He was frightened. He was as white as a sheet.''

Isaac R. Neuner testified that, between 3 and 4 o'clock in the afternoon of August 30, 1930, while he and Walter Manning were at work stacking grain for Homer Bidwell at a point about 150 yards south of the Bidwell house, he saw some person go to the Bidwell house, and a little later he ''saw a man walking toward the creek, toward the hog pen almost due west from the house, * * * about 75 yards from the house.'' Continuing, he testified:

''About that time there was a pretty high wind from the north, * * * and I thought I smelled cloth burning, and of course I knew that Walter smoked, and I smoked myself. And of course I thought we had fire in our clothes, and didn't want to get the grain on fire, and * * * I looked around and saw smoke coming out of the house. * * * We ran to the house as soon as we could. He was ahead of me and ran into the house and grabbed a bed and brought it out, and put out the fire as quick as we could. We got back about in an hour or an hour and a half after putting it out.''

Russell Burnett, a lad who lived in the vicinity of North Powder, testified that, on Saturday, June 27, 1931, the day Mr. Bidwell was killed, he saw the defendant in the vicinity of the Bidwell place standing by the running board of his car, ''and when I came from below he jumped in the car and went over the hill as fast as he could go.'' This witness thoroughly identified the car that the defendant was driving on that day as the one defendant had had in his possession the summer before.

Witness Gordon Derrick, who stated that, on June 27, 1931, he was living on the Government Gulch road, testified as to the correctness of a certain map showing the proximity of the Bidwell place to that road. He testified that he was acquainted with the defendant, and had known him since August, 1930; that he had seen him at different places; that, between 5 and 5:30 o'clock on June 27, 1931, he saw the defendant on the Government Gulch road, about 250 yards off the highway, fixing a flat tire of a Chevrolet car. As to his conversation with defendant at that time, he testified:

"I was curious. I asked him what he was doing back in the country. * * * Well, he said he understood there was a warrant for him, and he wanted to know if I had heard anything about it, and I told him no, that for several months I hadn't heard any talk. And then he said that he heard Bidwell was dead. I said Frank Bidwell was. He says: 'No, I think it was Homer.' And I says, 'No, Frank Bidwell died of pneumonia last winter.' And then he asked me where Manning was,—if he had come back from Idaho, and I told him I didn't know. And then * * * he wanted to know if Manning was paid,—if Bidwells paid him before he left, and I told him I didn't know. And he said, 'Well, he was well paid.' And then he said Bidwell gave him a dirty deal. And he said: 'When they get me, they will find out more about it'."

Witness testified that he saw the defendant a second time that day, and that defendant "just * * * stopped his car and hollowed at me, and says to me: 'Keep this under your hat for a few days'."

J. G. Anson testified that he was acquainted with the defendant; that defendant came to his home early one morning soon after the disappearance of his wife, "and he seemed to blame Bidwell and the Bidwell family pretty strong for the trouble (with his wife)."

He asserted that defendant claimed to him that Bidwell had interfered in his family, and that the defendant then stated that "any one that would interfere in a family ought to be killed."

Mrs. Lillian Schofield testified that, while the defendant was stopping at her home for a time after his wife had left, he said he "figured they (the Bidwells) was the ones that separated him and his wife, and he didn't like the idea of it, and there ought to be something done about it, and he was going to get his revenge. And my husband talked him out of it." Concerning his habits while staying at their home, she testified:

"Well, he was just there and gone, around every place else. We didn't know when he was going, or where he was going. He came in at all hours of night, sometimes early in the morning, and maybe early in the evening.

\*　　　\*　　　\*　　　\*　　　\*

"Q. He didn't say he would kill them (Bidwell and his wife)?

"A. He said once he was going to,—the night he came from Telocaset.

"Q. He was angry at them because they had separated him and his wife?

"A. That is the understanding, he told us, yes."

John F. Marler, an uncle of defendant's wife, testified that, near midnight on June 10, or 11, 1930, the defendant came to his home in Portland looking for his wife; that they (defendant and his wife) stayed in Portland until about July 2, when they were supposed to have started East; that defendant returned about August 15, related the circumstances of his wife's leaving him, asked if she was there, and declared "that the Bidwells was at the head" of their separation, and

that they were "a bunch of horse thieves." As to what the defendant said he was going to do, witness testified:

"He said that he had ought to go up there and blow them up with dynamite. * * * He talked a lot, and he worried a lot. * * * He was troubled, you see, and he could not eat, and he could not sleep, and he seemed to hold the entire blame against the Bidwells."

This witness testified that he did not see the defendant again until the following summer. Concerning his conversation with him at that time, he said: "I told Sullivan that the man Bidwell whom they had worked for up at North Powder was dead, and he remarked that he had ought to be dead."

Dan Graham testified that he saw the defendant on July 31, 1931, seven miles from Union. As to the circumstances of the meeting, he testified:

"I was coming down from Burnt River, and this man stood by the side of the road on the right-hand side as I came down, and kind of held his hand up at me, and I stopped and asked him if he wanted a ride, and he said he did, and I took him in and we struck out. I asked him how far he wanted to go, and he says: 'As far as you will take me'."

He testified that defendant was carrying a bundle, in which there was a gun with the barrel protruding therefrom about an inch and a half; that the defendant claimed he was ill; that, when they had passed through Union and had reached a point about a mile beyond that place, the defendant looked back, turned and looked back again, and said: "Let me out. There is a bunch after me." Witness slowed down intending to stop, and defendant jumped out, grabbed his bundle, and ran as hard as he could run to a log pile about 75 yards distant. Witness then notified the police.

Carl Ebert, deputy sheriff of Union county, testi-
fied that when he was called from La Grande to go over
there, he was told that Sullivan was "down the road by
a pile of logs"; that he, with others, went down there
"and they said Sullivan was out in the field." Con-
cerning the arrest, he said:

"You could just see his (defendant's) head, and we
drove until he raised up. He raised one hand out of the
brush, out of the weeds. When he rasied one hand I
saw it and I told him to throw his hands up, and so
he sat up and threw his hands up and lowered them a
couple of times, and the third time he left them up,
and we walked up to him and searched him　*　*　*
and brought him to town."

Witness testified that, when asked why he was
hidden there, the defendant replied that he was "rest-
ing." He also testified that a pair of pliers known
to the record as Plaintiff's Exhibit "H" was taken
from the defendant at that time.

The defendant contends that certain testimony
given upon the part of the State was inadmissible for
the reason that it tended to prove a separate and dis-
tinct crime.

It is a well-established general rule that, in the re-
ception of evidence, proof of another and distinct
crime than the one averred in the indictment cannot
be given in evidence: *State v. O'Donnell,* 36 Or. 222
(61 P. 892); *State v. McDaniel,* 39 Or. 161 (65 P. 520);
*State v. Casey,* 108 Or. 386 (213 P. 771, 217 P. 632).

■ As to the relevancy of showing motive for crime,
we direct attention to the following excerpt from
Underhill's Criminal Evidence (3d Ed.), § 503:

"Motive upon a trial for murder need not be shown,
although it may be; and where circumstantial evidence
is relied upon, it is material that motive be shown. The

absence of motive does not alone require that the accused shall be acquitted, though it may be considered in determining the presence of intention. Any evidence that tends to show that the defendant had a motive for killing the deceased is always relevant as rendering more probable the inference that he did kill him.''

In his great work on Criminal Evidence, Dr. Wharton teaches us that:

''When proof has been made of the *Corpus delicti* in a homicide prosecution, all facts and circumstances that tend to show motive on the part of the accused are relevant, and equally relevant are the relations between the accused and the deceased, and all ill feeling that existed between them. The application of the rule is not limited by the remoteness of such circumstances, as that goes only to the weight, and not to the relevancy. There is no rule by which remoteness that may affect the relevancy of such evidence can be established, but this must be determined from the circumstances of each case. It is not affected by the fact that the crime is out of proportion to the motive sought to be shown. * * *'' 2 Wharton's Criminal Evidence (10th Ed.), § 895.

At section 896, this eminent authority says:

''Motive in homicide is a question of fact to be determined by the jury; it may be inferred from the crime itself, or from the actions of the accused.''

■ And at section 902, with relation to desire for revenge as showing motive, the author states:

''To show the state of mind of the accused towards the deceased, it is relevant to introduce in evidence facts and circumstances relating to any ill treatment of the accused by the deceased. * * *

''Not only are quarrels and ill-will relevant in general, but the facts from which a stress of feeling may be reasonably inferred are also relevant.''

■ In the case of *State v. Casey,* supra, the court quoted from the well-reasoned case of *State v. Adams,* 20 Kan. 311, 319, opinion by Justice Brewer, where that eminent jurist, speaking with reference to the admissibility in evidence of proof of other and distinct crimes than the one averred in the indictment, said:

"It is clear that the commission of one offense cannot be proved on the trial of a party for another, merely for the purpose of inducing the jury to believe that he is guilty of the latter, because he committed the former. You cannot prejudice a defendant before a jury by proof of general bad character, or particular acts of crime other than the one for which he is being tried. And on the other hand, it is equally clear that whatever testimony tends directly to show the defendant guilty of the crime charged, is competent, although it also tends to show him guilty of another and distinct offense. * * * A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him. A man may commit half a dozen distinct crimes and the same facts, or some of them, may tend directly to prove his guilt of all, and on the trial for any one of such crimes it is no objection to the competency of such facts as testimony, that they also tend to prove his guilt of the others."

See, also, *People v. Molineux,* 168 N. Y. 264 (61 N. E. 286, 62 L. R. A. 193). Many like cases are cited in the Casey opinion.

From the case of *People v. Lane,* 100 Cal. 388 (34 P. 856, 860), we take the following valuable and instructive excerpt:

"Motive precedes intention, and is the cause or reason upon which it is formed; and if this testimony clearly tended to show a pre-existing motive for the killing of Canfield, it would be admissible as tending to show that the homicide was not accidental, but was intentional and premeditated."

■ And in *State v. Elwell,* 105 Or. 282, 284 (209 P. 616), this court said:

"Evidence of motive is relevant in criminal prosecutions to identify the accused as the one who committed the crime [citing many authorities]."

On page 304 of this opinion we cited and quoted from *People v. Fitzgerald,* 156 N. Y. 253 (50 N. E. 846), as follows:

"In the investigation of all charges of crime it is competent to prove a motive on the part of the accused for the commission of the criminal act. Motive is an inducement, or that which leads or tempts the mind to indulge the criminal act."

From the foregoing, it should be plainly apparent that evidence of other crimes than the one charged in the indictment is not admissible. This rule is accepted by the various jurisdictions in this country. But there are certain exceptions to the general rule that are as firmly established in our jurisdiction as is the rule itself. See *State v. Walters,* 105 Or. 662 (209 P. 349.) A case strongly supporting the rule and the exceptions is *State v. Martin,* 47 Or. 282 (83 P. 849, 8 Ann. Cas. 769). Another leading case is *State v. Hembree,* 54 Or. 463 (103 P. 1008). Another that is equally strong is *State v. Finch,* 54 Or. 482 (103 P. 505). And to like effect, see *State v. Wilkins,* 72 Or. 77 (142 P. 589).

Measured by the authorities cited and quoted herein, the conclusion that the court's ruling was in accordance with the well-established law is imperative.

The record pictures this defendant as a man who harbored deep resentment against any person whom he suspected of interfering with his domestic affairs, even though such interference were for the purpose of protection from impending danger. The wife, who left him sitting in the parked car at Baker, did not

wilfully desert her husband, but the testimony clearly indicates that she fled because she feared death at his hands. Following a statement by his wife that she did not wish to return to Missouri, defendant emphatically declared to her: "Yes, you are going, or I will kill you and take you like a stuck hog." Soon thereafter, this woman, pale and trembling with fear, came to the much-maligned Mrs. Bidwell and pleaded for protection. After his wife had made her escape, the defendant commenced a vigilant search for her, returned to the Bidwell home that night to continue his search, then drove pell-mell to Portland and return. Upon again arriving at the Bidwell home, he hysterically exclaimed that he was to blame for the difficulty with his wife. He then asked Mr. Bidwell if he had ever heard her say where she was going; and when he answered that she had said she was liable to go to her father in Canada, defendant said: "Well, I will kill her and her father both." In the hope that his wife might return to the Bidwells, he took up his headquarters at the home of J. E. Schofield, one of Bidwell's neighbors, and remained in the neighborhood for about two weeks, devoting much of his time to annoying Mr. and Mrs. Bidwell. Both Schofield and his wife testified that he declared that he would have revenge; and it was perhaps through their persuasion that he did not execute his threat to revenge himself upon the Bidwells during that time. It was at the Schofield home that the defendant was staying at the time of the fire at the Bidwell house, and it was only a day or two following the fire that he left, telling Mr. Schofield that he was going to Meacham and would be back in about 10 days. Instead of returning to the Schofield home, he went to Missouri, and was not seen in the neighborhood again until the following summer.

The following observations by Dr. Wharton are peculiarly appropriate here:

"The motives usually assigned in homicide are the desire for revenge, * * *." 2 Wharton's Criminal Evidence (10th Ed.), § 892.

As hereinbefore shown, the testimony places this defendant within one and two-tenths miles of the Bidwell field on the date and about the hour of the commission of the homicide. We have also shown that, after the disappearance of defendant's wife, he proclaimed his ill will against Homer Bidwell, and declared his purpose to have his revenge. Again and again he asserted that the Bidwells had interfered in his family affairs, and he stated that he purposed to avenge himself for the alleged wrong. Russell Burnett, a lad of 12 years, saw the defendant in the vicinity of the homicide on the day Homer Bidwell was slain, and saw him jump into his car and drive away "as fast as he could go" when he realized that he had been observed. At about the hour of the homicide Gordon Derrick saw the defendant repairing a flat tire of his automobile in the vicinity of the Bidwell home, at a point about 250 yards from the highway. We have already set out the declarations made by defendant to Derrick, and his request to Derrick to say nothing about having seen him. Witness James Anson saw and recognized the defendant and his car in that neighborhood about the time that Bidwell was slain. Hobert Keeney saw the defendant driving rapidly towards Union at about 6 or 6:30 in the evening of the day Bidwell was slain. When defendant was arrested the officers took from his person a pair of pliers that were afterwards identified as the property of the Bidwells which had been taken from their house upon the

occasion of the fire. At the pile of logs to which defendant rushed for shelter when he left witness Graham's automobile, a telescope was found that was identified as the property of Dean Bidwell, which also was missing from the Bidwell house after the fire. Certain shotgun shells answering the exact description of those that were taken from the Bidwell home at the time of the fire were given by the defendant to witness Schofield on the morning after the fire.

■ The testimony placing defendant in the vicinity of the Bidwell ranch at the time of the homicide he answered by attempting to establish an alibi. He offered some testimony that tended to establish his claim that he was in and about Ontario at or about the time that the State claims Bidwell was shot to death. This testimony, as well as all other evidence adduced at the trial of the cause, was for the jury. The court, with much care, charged the jury as to its whole duty in the premises; and there was no contention by the defendant that the evidence was insufficient to justify the verdict.

■ The defendant charges that he was prejudiced by the following instruction:

"A witness may be impeached by the party against whom he is called, by contradictory evidence, or by evidence that he or she has made statements out of court inconsistent with his or her present testimony. While the law permits the impeachment of a witness in these manners, yet if you believe that such witness, while on the witness stand, gave a truthful, candid and honest statement of the facts and circumstances surrounding the transaction in question, then you should not disregard his or her testimony, but you should give it such faith and credit as in your opinion it is entitled to."

This instruction is in accord with the holding of our court in the case of *State v. Birchard*, 35 Or. 484 (59 P. 468). See, also, 16 C. J., p. 1016, § 244. However, we have searched the record in vain in an attempt to ascertain the grounds of counsel's objection to the instruction.

The record in this case is long. We have carefully studied it from beginning to end, and find nothing therein to justify an order of reversal. The defendant has had a fair and impartial trial; no person can ask more. The judgment of the trial court will be affirmed.

. BELT, J., absent.