STATE *v.* GILLIS

(59 P. (2d) 679)

*Chris Boesen,* of Portland (Green, Tanner & Boesen and Tom Garland, all of Portland, on the brief), for appellant.

*Joe P. Price* and *Frank S. Sever,* Deputy District Attorneys, both of Portland (James R. Bain, District Attorney, of Portland, on the brief), for the state.

BELT, J. Defendant Gillis appeals from two judgments of conviction of the crime of assault with a dangerous weapon. Under one indictment Gillis was jointly charged with Willis Billingham, Curt Billingham, and Jay Lowell with having committed an assault with a dangerous weapon upon Alfred Ertman on August 27, 1935. In the second indictment the above named persons were also jointly charged with having, at the same time and place, committed an assault with a dangerous weapon upon Elizabeth Ferguson. Willis and Curt Billingham were first tried and convicted on both charges. Jay Lowell then pleaded guilty to both charges and thereafter offered evidence on behalf of the State. The cases against the defendant Gillis were then consolidated, under and by virtue of chapter 40, Oregon Laws 1933, and, as a result of the trial, judgments of conviction were obtained. Gillis was sentenced to serve a term of 10 years in the penitentiary on each charge, the sentences to run consecutively.

The principal contention of the defendant on this appeal is that error was committed in receiving evidence relative to the commission by defendant of crimes other than those charged in the indictments. To fully comprehend this assignment of error a brief statement of the facts is necessary.

The defendant, John Gillis, is secretary-treasurer and business agent of the Woodsawyers' Union in the city of Portland. The state introduced evidence tending to show that for several months preceding the alleged assaults a bitter controversy was being waged between the Woodsawyers' Union men and non-union men concerning the cutting of prices for wood sawing below the union scale. Alfred Ertman owned and operated a wood saw but did not belong to the union. He had once been a member but, according to his testimony,

had dropped out because of being unable to pay the dues. Ertman testified that he was warned by the defendant, Gillis, that he would have to pay up his membership dues "before you go out and cut wood". Ertman, however, did not pay up and persisted in cutting wood. In June, a few days after this alleged conversation, the truck belonging to Ertman was smashed with a sledge hammer. The evidence does not disclose who did it.

David Lamora, a wood saw helper, testified that about August 1, 1935, the defendant, Gillis, asked him if he "would put a man in the hospital for $100 or $50". He said that Gillis referred to Alfred Ertman. Lamora testified that he refused to accept the job.

Gerald (Spud) Murphy testified that on August 8, 1935, the defendant, Gillis, employed him to "beat up" on non-union wood sawyers. Under the terms of this agreement, Gillis was to pay Murphy $50 for each "beat up", the latter being guaranteed protection. In the event he was jailed, he was to receive the sum of $5 a day during confinement. Murphy said that, pursuant to this agreement, he called at the home of the defendant on August 12, 1935, and the latter gave him a written list of the wood sawyers he did not want to operate. It was through Murphy that the Billingham brothers and Jay Lowell, the taxicab driver, agreed to join in the "beat up" enterprise.

Dan Dietrich, a non-union man engaged in the operation of a wood saw, testified to an assault upon him and his crew on August 15, 1935. He said he recognized "Spud" Murphy as one of those engaged in the attack. He further testified that he had a conversation with the defendant, Gillis, after Ertman was shot, concerning reinstatement in the union upon payment of delinquent dues and a fine of $100, and that Gillis told him,

"The best thing for you to do is to come in and pay the fine. Don't think you can get out of it. * * * You will have the same thing happen to you that happened to Bighaus and what Mr. Ertman got."

Arnold Smith, who worked as a wood saw helper with Dietrich's crew, thus testified as to the assault on August 15: "* * * we were sawing wood at 9th and Siskiyou, and four men come up on a car and the car drove on and after a little bit four men came back and they had saps and blackjacks and they proceeded to beat up on us."

J. C. Bighaus, a non-union wood sawyer, testified concerning an attack on August 16, 1935, by "Spud" Murphy and the Billingham brothers wherein three or four shots were fired at the wood sawing crew. He also related a conversation with Gillis wherein the latter said, "Bighaus, if I can't stop you by picketing, I'll put you off the street altogether and put you in the grave."

Ertman fixed up his truck and started to work again. While he and his helpers were engaged in work, the Billingham brothers and "Spud" Murphy—all of whom were thugs with criminal records—came upon them and proceeded to smash the engine and beat up the crew. This assault occurred about eight or 10 days prior to the assaults charged in the indictments. Ertman, with remarkable fortitude and courage, within a few days again repaired his wood sawing equipment and started to work. At home about 9:45 on the evening of August 27, 1935, he was talking to his landlady, Mrs. Elizabeth Ferguson, about payment of rent, when a pistol shot rang out from the darkness and a bullet passed through his right breast, continuing its course through the hand of Mrs. Ferguson.

There is no testimony that Gillis was present at the time of the assaults above mentioned or those charged in the indictments. However, there is ample evidence showing his connection therewith. It is the theory of the state, supported by the record, that Gillis employed the accomplices above mentioned to make these various assaults on non-union wood sawyers for the purpose of compelling them to join the union or stop sawing wood. Gillis denies any participation whatsoever in the crimes charged in the indictments or in those above referred to, evidence of which was received over his objection. There are many other facts and circumstances which might be related, but it is believed that the above brief statement of facts will suffice for an understanding of the legal questions presented.

It is well-established general rule that proof of other and distinct crimes than the one charged in the indictment can not be given in evidence: *State v. Goodloe,* 144 Or. 193 (24 P. (2d) 28) ; *State v. Sullivan,* 139 Or. 640 (11 P. (2d) 1054) ; *State v. Casey,* 108 Or. 386 (213 P. 771, 217 P. 632) ; *State v. Walters,* 105 Or. 662 (209 P. 349).

It is equally well settled that there are certain exceptions to the general rule. It is fundamental that the state is entitled to the benefit of any evidence relevant to the issue even though it concerns the commission of collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment the general rule of exclusion has no application: Wharton's Criminal Evidence (11th Ed.) § 345, citing in support of the text, numerous authorities among which are: *State v. Sullivan,* supra, and *State v. Bailey,* 90 Or. 627 (178 P. 201). The rule of evidence applicable is thus well stated by Mr. Justice

Brewer in 20 Kan. 311, and quoted with approval by this court in *State v. Casey*, supra:

"It is clear that the commission of one offense cannot be proved on the trial of a party for another, merely for the purpose of inducing the jury to believe that he is guilty of the latter because he committed the former. You cannot prejudice a defendant before a jury by proof of general bad character, or particular acts of crime other than the one for which he is being tried; and, on the other hand, it is equally clear that whatever testimony tends directly to show the defendant guilty of the crime charged is competent, although it also tends to show him guilty of another and distinct offense. * * * A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him. A man may commit half a dozen distinct crimes and the same facts, or some of them, may tend directly to prove his guilt of all, and on the trial for any one of such crimes, it is no objection to the competency of such facts as testimony, that they also tend to prove his guilt of the others."

In the leading case of *People v. Molineux*, 168 N. Y. 264 (61 N. E. 286, 62 L. R. A. 193), the exceptions to the general rule are thus stated:

"Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial."

Defendant relies strongly on *State v. O'Donnell*, 36 Or. 222 (61 P. 892), wherein Mr. Justice MOORE undertook to summarize the exceptions to the general rule as stated by Underhill on Criminal Evidence (1st Ed.) § 87. In the O'Donnell case the exceptions were

thus classified: "(1) If several similar criminal acts are so connected by the prisoner, with respect to time and locality, that they form an inseparable transaction, and a complete account of the offense charged in the indictment can not be given without detailing the particulars of such other acts, evidence of any or all of the component parts thereof is admissible to prove the whole general plan; * * *; (2) When the commission of the act charged in the indictment is practically admitted by the prisoner, who seeks to avoid criminal responsibiliy therefor by relying upon the lack of intent or want of guilty knowledge, evidence of the commission by him of similar independent offenses before or after that upon which he is being tried, and having no apparent connection therewith, is admissible to prove such intent or knowledge, which has become the material issue for trial * * *; (3) If the facts and circumstances tend to show that the prisoner committed an independent dissimilar crime, to enable him to perpetrate or to conceal an offense, such evidence is admissible against him upon an indictment charging the auxiliary crime, when the intent to perpetrate or conceal such offense furnished the motive for committing the crime for which he is put upon trial. * * *; (4) When a crime has been committed by the use of a novel means or in a particular manner, evidence of the defendant's commission of similar offenses by the use of such means or in such manner is admissible against him, as tending to prove the identity of persons from the similarity of such means, or the peculiarity of the manner adopted by him. * * *; (5) When the prisoner is charged with any form of illicit sexual intercourse, evidence of the commission of similiar crimes by the same parties is admissible to

prove an inclination to commit the act for which the accused is put upon his trial.''

It is not believed that the learned jurist was endeavoring to lay down any hard and fast rule covering all factual situations. We apprehend, if a collateral crime is relevant to the issue, evidence thereof would be received notwithstanding it might not come precisely within any of the above classifications. However, in our opinion, the instant case comes well within the purview of the above first classification as the collateral crimes in question were admissible to prove the ''whole general plan''.

In *Hawes v. State*, 88 Ala. 37 (7 So. 302), the defendant was on trial charged with having killed one of his children. There were pending two other indictments against him for the murder of his wife and another child. The state introduced evidence to show that the defendant's motive for killing them all was to remove an obstacle to the consummation of a second marriage. The court held that any evidence connecting the defendant with the murder of the other members of his family was relevant and admissible.

In the instant case the motive of the defendant for the commission of the various assaults upon the non-union men was the same as that which prompted him to commit the assault charged in the indictments, viz, to compel the non-union men to join the union or quit business. Each assault was a part of the same composite plan or scheme. Each assault was a link in the chain of circumstantial evidence tending to show the commission of the crimes charged in the indictments. While motive was not essential to proof of the crimes charged, it was extremely valuable in enlightening the jury as to what prompted these hired thugs to shoot a man they had never known. Indeed,

the state would have been practically blocked in its prosecution of these charges had the door been closed to inquiry as to the general plan or scheme the defendant had in mind.

■ The next assignment of error is predicated upon the failure of the court to instruct the jury as to the purpose and effect of evidence tending to show the commission of crime other than those charged in the indictments. We agree that the trial court might well have done so but, in view of the fact that no instructions were requested by defendant relative to such matter, he is in no position to complain. This rule is so well established in this jurisdiction that citation of authorities is not deemed necessary.

We find no reversible error in the record. It follows that the judgments of conviction are affirmed.