Argued at Pendleton May 6; affirmed June 25, 1946

# STATE *v.* BAILEY
(170 P. (2d) 355)

M. A. Biggs, Judge.

*Charles W. Swan,* of Vale (A. L. Fletcher, of Nyssa, on brief), for appellant.

*E. Otis Smith,* of Ontario, District Attorney for Malheur County, for respondent.

Before Belt, Chief Justice, and Rossman, Lusk, Brand and Hay, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment of the circuit court which found him guilty of the crime of first degree murder and ordered his execution. The

judgment is based upon the verdict of a jury which did not make a recommendation for life imprisonment, as permitted by Art. I, § 37, Constitution of Oregon, and § 23-411, O. C. L. A. One Theodore R. Chambers, a sergeant in the Department of State Police, was the victim of the crime. According to the state, the homicide occurred April 29, 1945, in the basement of the Annex schoolhouse which is located in Malheur county.

The defendant presents nine assignments of error. Before stating them we shall mention facts developed by the evidence.

Saturday morning, April 28, 1945, an automobile standing near Highway No. 30, in Malheur county, attracted the attention of some peace officers, among whom were the aforementioned Sergeant Theodore R. Chambers and officers H. C. Snider, R. N. O'Brien and W. F. Bones, also members of the State Police. The car stood near milepost 399. Upon examining it the officers found in it three guns, some shells and four bayonets. They consulted a list of stolen cars which they had and discovered that the car was a stolen one. Officer Snider thereupon drove the car to the Ontario police station. Officers Bones and O'Brien looked about to determine whether anyone was in sight who was connected with the car. Upon the slopes which rose from the roadway they saw two men who were firing guns and called to them. When they walked toward the men the latter disappeared up a draw. Bones and O'Brien spent the rest of the day searching for the men and instituted, what they termed, a road blockade. Their efforts to locate the men were unavailing.

The next morning, that being Sunday, at 5:30, Sergeant Chambers and officer O'Brien returned to the place where they found the car and observed some

fresh footprints. They followed the footprints to a point within a mile of the Annex schoolhouse where they lost the tracks. The Annex school is near the Snake River, about a half mile inside the Oregon-Idaho line. Chambers and O'Brien then drove to Weiser and talked to some other officers who were helping with the blockade. After the noon hour they reentered their car and headed for the place where they had lost the trail. They were followed by another car which carried Clarence Saunders, chief of police of Weiser, and Al Walters, a deputy sheriff of an Idaho county. The Annex schoolhouse was on their route and when the cars came to it they stopped and the officers entered the school grounds. There they observed that a basement window had been loosened and saw some tracks leading in and out of the structure which were similar to those near the car. After a key had been obtained the officers entered the schoolhouse which was one story high, 38 feet, 11 inches, by 44 feet, 11 inches, in ground dimensions, and had a basement. Since the ground floor appointments of the building are a matter of no importance to the issues before us, we shall pass them by, with the exception of stating that a staircase on the south side of the school led from the ground floor to the basement.

Extending along a part of the south wall of the basement were three closets which have been identified as closets 1, 2 and 3. Number 3 is in the southeast corner of the basement. Diagonally across from it, that is, in the northwest corner, is a coalbin, nine feet, seven inches, by twelve feet, nine inches, in size. The door of closet 3 faces north and as it opens it swings to the northeast. The door of the coalbin faces east and as it opens it swings east and north. Thus, a person in closet 3 and another in the coalbin, by opening

the doors, could gain a view of the basement without being impeded by the doors. If either door was opened slightly, a weapon could be pointed out of it into the middle of the basement and the door itself would thereupon shelter the one who held the weapon. He would thus have command over most of the basement.

Upon the occasion when the officers entered the schoolhouse the defendant was in the coalbin and a companion of his, Ronald William Duffy, was in closet 3. Both of the men were armed and the doors to the compartments were closed. The officers apparently suspected that someone was in the schoolhouse, but had no knowledge that either the defendant or Duffy were in the compartments just mentioned. After the officers had examined the ground floor of the building they went down the stairs and entered the basement with their guns drawn. Chambers was in the lead and O'Brien, acting upon Chambers' instructions, covered him with his rifle. Chambers first entered closet 1, and finding no one there proceeded to closet 2 where he discovered two sets of blankets upon the floor. He then went on to closet 3. Obedient to methods adopted by the Oregon State Police, Chambers approached the door of closet 3 in a crouch. In his right hand he held a revolver and with his left hand reached for the door knob. Before his hand reached the door the latter flew open and Duffy appeared in the opening. O'Brien was a few feet back of Chambers, and Saunders was to the rear of O'Brien. When Duffy appeared he called out, "You will never take us," accompanying the statement with a profane epithet. At the same moment he opened fire. Either the violent movement of the door or his own efforts caused Chambers to fall back. O'Brien shortly fired a shot into closet 3 and as he was reloading his rifle he was struck in the right

shoulder by a bullet that came from the coalbin. Up to that moment the officers had not realized that anyone was in the coalbin. As a result of the wound, O'Brien's gun fell from his hands and he dropped to the floor, momentarily unconscious.

Members of the Oregon State Police are taught to lie on the floor or ground when under fire and obtain shelter if possible. After Duffy began to fire at Chambers, Saunders observed Chambers crawling backward to some benches a few feet to his rear which would afford shelter. Seemingly he did not realize that his movement brought him nearer to the defendant who was a few feet away in the coalbin. Saunders, referring to the defendant, said:

"All I could see was his main arm, approximately maybe seven inches up the arm, and the gun, and the gun was pointed at Sergeant Chambers over near the stairway, and there was one shot or two fired and I shot at this arm sticking out of the coalbin. I know there were some more shots fired and Sergeant Chambers went over, slumped over on his left side, and immediately after that the man in the coalbin said, 'He asked for it and got it'."

Chambers was hit three times. One of the bullets fractured his left femur bone. According to a physician, Chambers could no longer have stood unassisted after that happened. The other two were mortal wounds; one entered his abdomen and was capable of causing death within thirty minutes; the other pierced his skull and, according to a physician, caused instantaneous death.

After Chambers and O'Brien had been shot, Saunders threw his gun into the open and thereupon the defendant and Duffy came out of their hideouts. Duffy took O'Brien's rifle and the defendant took

Chambers' weapon and shells. Then, driving Saunders before them, the men entered the staircase. In the meantime, Bones had reached the building and was at the head of the stairs when the three just mentioned proceeded to ascend. An exchange of bullets took place with the result that the defendant and Duffy drew Saunders back into the basement. At that point either Duffy or the defendant demanded that Bones give them an automobile and permit them to escape; otherwise they would take Saunders' life. The proposition was rejected, but shortly the two men, with Saunders as a hostage, made their way out of a basement window and into a field. There they were detected and Bones, Walters and some farmers took in pursuit. After an exchange of volleys Duffy was killed, Saunders was wounded, and the defendant, after being twice hit, surrendered. When the defendant was arrested he was armed with four guns and a knife. The latter was strapped to his back.

At five o'clock on the day of the affray the aforementioned H. C. Snider called upon the defendant in a Weiser hospital where a physician and two nurses were dressing his wounds. According to Snider, the defendant "was gritting his teeth and said he could take it and to go ahead." Thereupon Snider questioned him about Chambers' death. The defendant was in pain, but, according to Snider, "carried on a normal conversation." There is no contention that the defendant answered Snider's questions through fear, threats, promises, violence or any inducement. Seemingly he was in possession of his faculties and spoke voluntarily. Snider swore that as the defendant related the incidents he reduced them to writing, later read the paper to the defendant and then handed it to him. The defendant signed the writing. It covers three sheets and is writ-

ten in ink. It is readily legible. There is no contention that Snider failed to write accurately the statements which the defendant made. The following is a copy of the paper:

"April 29, 1945,
5:15 P. M.

"I, Kenneth William Bailey, before Oregon State Police Officer H. C. Snider, and Washington County Deputy Sheriff Al Walters, at the Weiser General Hospital, Weiser, Idaho, make the following statement freely and voluntarily of my own free will, without threat or promise, and I am informed that this writing may be used against me in court at 5:20 P. M. April 29, 1945.

"I left Portland, Oregon, on the 25th of April, 1945 accompanied by Ronald William Duffy in a stolen 1941 Ford sedan which I didn't know at the time it was stolen, bearing Oregon license plate 49-585. When we left Portland, Oregon, I had a 32 Automatic Savage pistol and Duffy had a M1 30-06 Government automatic rifle. At that time Duffy was operating the above Ford sedan and picked me up at 12th Avenue and Sandy Boulevard about midnight. We stole a barrel of gasoline from the Kold Kist Ice Company on 37th Street and Sandy Boulevard, Portland, Oregon, and also the license plate 456-974. We then left for Klamath Falls, Oregon, south to Eugene, Oregon, following the super highway to Klamath Falls. We arrived at Klamath Falls the next morning about 8:00 A. M. From there via Burns on Highway 20 to Parma, Idaho, thence to Caldwell, Idaho, to Nampa, from there to Meridian, Idaho, not stopping enroute. We arrived in Meridian 2:00 P. M., April 26, 1945, and looked over a hardware store then to Boise. We got a room in Nampa at a motel just across the railroad tracks, toward Meridian. We returned to Meridian, just after dark about 9:30 P. M. We burglarized a hardware store, the largest of two in Meridian, I don't know the name of the

business. From there to Boise, Idaho, and attempted to burglarize the Bairs's Cleaners, Boise, Idaho. We were chased off by some person. We got back to Nampa about midnight and went to bed. The following night we went to Caldwell and burglarized a service station-garage. (Name unknown). We then went back to Nampa and had the run in with the Nampa City Police while stealing gasoline at a service station. We took two 38 special caliber pistols from the two police. We went to Linder, Idaho, and Boise river, crossed the river into Oregon at Weiser. Up to where we parked on the Snake River, Highway 30 near milepost 399, arrived about 1:00 P. M., April 28th, 1945. When we saw the officers near our car we were target practicing with the 38 pistols (all 3). When we saw the officers, we climbed the hill. We went straight east from the top of the ridge to the farm house, climbed the ridge on the far side (east) and stayed there all day. That night after dark we returned to the place where we left the car and was looking for a state police car. Not finding any we started walking for Weiser. We arrived at the Annex school building about midnight and stayed there until we cased the river to swim across the river but decided not to. We stole a couple of blankets from a car across from the Shell Station on the—a Jap house on the west side of the highway. We returned to the schoolhouse and stayed there until the police came. I was in the coal bin on the north west corner of the basement and Duffy was in a small closet on the south side about in the center, south side nearest to the east wall. I shot the State Officer that was wounded and Duffy shot the officer that fell. We were—I was using a 38 positive and Duffy was using the 38 special. At the latter part of the fracas Duffy made the statement, 'This'n out of commission, get the other one (meaning Sergeant T. R. Chambers) get the other one (meaning Saunders).' We then took Saunders and headed north across an open field. About three-

fourths of the way across the field Duffy got hit and fell to the ground. I and Saunders continued on across the field. I got hit on the right side—Buttox (a flesh wound). Just after we left the fence, Saunders got hit in the arm, then I got hit in the shoulder. I then surrendered and was taken to the hospital at Weiser.''

Whether or not Sergant Chambers and the men working with him knew of the crimes committed in Idaho by the defendant and Duffy is not disclosed by the record, but the appellant's brief indicates that they did.

May 29 O'Brien visited the defendant in the Malheur County jail. The officer was in his uniform and defendant recognized him. According to O'Brien, the defendant ''was very willing to talk about what happened down there.'' O'Brien added: ''I asked him a few questions and he was very obliging in answering them.'' There is no claim that O'Brien employed any inducements or that the defendant did not speak freely and voluntarily. O'Brien gave the following testimony:

''Well, the first thing the defendant, Mr. Bailey, looked at me and he said, 'You are the officer that I shot in the back at the schoolhouse.' I said, 'That's right.' He said, 'That was quite arty.' I said, 'Yes, it was.' I says, 'I hate to admit it, but I am big enough to admit it, but you sure as hell had us fixed up. You had it well planned.' He said, 'Well, we ought to.' ''

Continuing, O'Brien testified:

''He said that he had planned where to station themselves in the basement, also that he was to station himself in the coal bin because he was just as good a shot left handed as he was right handed, and that is the reason he took the coal bin.''

Having given the foregoing testimony, O'Brien was asked whether the defendant made any other statement, and replied:

"Outside of 'It was a good party as long as it lasted.' As I went out of the door he said that."

John Coopman, a deputy sheriff of Malheur County, testified that he had several conversations with the defendant concerning the shooting. There is no claim that he employed any promises or threats, and there is no contention that when the defendant spoke to Coopman he was not acting from his own free volition. Concerning a conversation held on May 12, Coopman testified:

"He told me at that time that they heard the officers come up to the basement and that they had made up their mind not to take a pinch. * * * That is exactly what he said; he said that they had decided not to take a pinch and that they had talked it over what to do and when they heard the officers they said, 'That's cops.' Then he said, 'We had our guns lying on the table and we had planned where to go and I took this place in the corner. When we heard them we went to our hideouts.'"

Coopman swore that he heard what was said upon the occasion when O'Brien called upon the defendant. He reiterated O'Brien's testimony, and added:

"He said, 'We had it pretty well figured out what we were going to do. We had it pretty well planned. We heard you coming. We had it pretty well planned and', he said, 'It was quite a party, a lot of fun while it lasted.'"

According to Coopman, the defendant's stepmother called upon him upon one occasion, and concerning the visit, Coopman swore:

"Bailey told her that they were running from the law and they hid out in this basement of the

schoolhouse and when they heard the officers they figured if anybody came in after them, any officers came in after them, they would try to get the drop on them, and in his words, 'We would anchor them together.' He said, 'We would handcuff them together and take their guns and try to get away with a car and maybe two.' He said, 'That didn't work out so good because they fought back.' "

Then Coopman was asked whether upon that occasion the defendant made any statement "relative to who shot Ted Chambers." He replied:

"Yes, she asked him if he did and he said, 'Well, I don't know. I was shooting at him and' he says, 'they say he was shot on the left side so I guess I must have; I was the only one over there.' "

The defendant did not testify, but called four witnesses, two of whom did nothing more than describe the location of some of the bullet marks upon the basement walls. Another witness described the guns which the defendant and Duffy had carried. The fourth delineated the combat methods in use by the Oregon State Police. Thus, the accounts of the shooting, as portrayed in the writing prepared by Snider and in the statements for which O'Brien and Coopman vouched, were unchallenged.

The above review of the evidence will suffice for the purposes of consideration of the assignments of error. The appellant's brief argues jointly the first and second assignments of error. We shall consider them together. Assignment of error I is predicated upon a ruling which permitted the district attorney, over the defendant's objections, to include the following in his opening statement to the jury:

"The State will show that on the morning of April 28, 1945, an automobile was concealed on the

side of the road taking off from the Old Oregon Trail on U. S. Highway 30, near mile post No. 399. This is located as some of you know the territory, on the Snake River Canyon.

"This location is sometimes described as the Slides down there on the Snake River; that the State police officers investigated the car and found numerous guns and boxes of assorted ammunition in the car, and while investigating the car they heard some shots fire up on the hillside above the car."

Assignment II is thus expressed in the appellant's brief:

"The Court erred in permitting the witnesses H. C. Snider and William Bones to testify over Defendant's objection concerning the recovery of a stolen automobile by peace officers on the day preceding the date of the crime charged in the Indictment."

We think that we have sufficiently indicated the testimony given by Snider and Bones which constitutes the subject matter of attack in the second assignment of error.

In support of the above assignments of error, the appellant cites: *Boyd v. United States,* 142 U. S. 450, 12 S. Ct. 292, 35 L. Ed. 1077; *State v. Gillis,* 154 Or. 232, 59 P. (2d) 679; *State v. Casey,* 108 Or. 386, 213 P. 771, 217 P. 632; *State v. Jensen,* 70 Or. 156, 140 P. 740; *State v. Dunn,* 53 Or. 304, 99 P. 278, 100 P. 258; *People v. Molineux,* 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193; 26 Am. Jur., Homicide, § 314, p. 367-8.

Immaterial and irrelevant evidence, of course, should be excluded, especially if it indicates that the defendant committed a crime other than the one mentioned in the indictment. The prosecution is never

permitted to introduce evidence showing that the defendant committed other crimes for the sole purpose of blackening his reputation and thereby rendering it easier for the jury to reach a verdict of guilty. The state, however, contends that the evidence to which these two assignments of error advert showed motive. None of the above authorities hold that evidence of motive is immaterial and, therefore, inadmissible. It will be observed that the above list includes 26 Am. Jur., Homicide, § 314, p. 367. A section of that volume which is directly in point is § 352, p. 398, which reads:

"A well-recognized exception to or limitation upon the general rule excluding proof of the commission of other crimes by the accused exists where the proof of such other crimes tends to establish motive on the part of the accused for the commission of the particular crime charged. Accordingly, in a prosecution for homicide, evidence of other crimes committed by the defendant which are in time and circumstances so intimately connected with and a part of the crime with which he is being charged as to show a motive for the commission of the homicide or a state of mind indicating a purpose for its commission is admissible to establish such motive or state of mind. The theft of a revolver by the defendant may be shown, in a prosecution for murder of a police officer, as indicating fear of arrest as a motive. To be admissible, however, such evidence must shed some light upon the question of motive and be consistent with the prosecution's theory as to the defendant's reason for killing the deceased."

In part support of that statement, *State v. Martin,* 47 Or. 282, 83 P. 849, 8 Ann. Cas. 769, is cited, which holds that evidence showing that the defendant committed another crime is admissible if it establishes motive. *McHenry v. United States,* 51 App. D. C. 119,

276 F. 761, 34, A. L. R. 1109, which is also cited, passed upon facts substantially similar to those before us.

The appellant's brief says:

"The fact of the matter is that on April 28th the Oregon officers were working with peace officers from the State of Idaho endeavoring to locate the persons who disarmed two Nampa policemen in the State of Idaho the night before. The Oregon police accidentally came across a parked automobile and upon investigation discovered the car to be a stolen vehicle."

Apparently Sergeant Chambers and the officers who were working with him did not know that the two men who were seen on the hill above the stolen car were the men who had committed a series of depredations in the State of Idaho, including the felonious disarming of the two Nampa officers, but the defendant and Duffy knew that they were those two men, and, according to the defendant's statement to John Coopman, they had made up their minds "not to take a pinch" for their crimes. After they had taken refuge in the schoolhouse, the defendant and Duffy planned how to resist arrest and to shoot it out with any officers who would attempt to take them. Accordingly, when the defendant heard the officers approach his hideout, he had a motive for the commission of the crime charged against him.

Wigmore on Evidence, 3d ed., §§ 385 to 390, shows that evidence which establishes motive is admissible even though it attributes to the defendant the commission of other crimes. Section 390 says:

"The circumstances which might excite a desire to kill are innumerable. * * * The expediency of preventing the discovery of a former crime, or of

evading an arrest or a prosecution for it, may lead to the desire to kill."

The author cites numerous decisions which illustrate his statement. Three decisions of this court, selected by us at random, bear out Dean Wigmore's observation. They hold that evidence showing motive, even though it proves that the defendant committed other crimes, is admissible: *State v. Walters*, 105 Or. 662, 209 P. 349; *State v. Hembree*, 54 Or. 463, 103 P. 1008; and *State v. Wilkins*, 72 Or. 77, 142 P. 589. *State v. Walters* was based upon facts similar to those now before us. The trial judge had received evidence that the accused and a companion, shortly before the accused killed an officer who attempted to arrest him, committed a series of robberies. Mr. Justice HARRIS, in sustaining the conviction, showed with remarkable clarity and cogency that the evidence was admissible to establish a motive on the part of the defendant. He said:

"The killing would not have occurred if the robberies had not been committed. The robberies furnished the motive for the killing."

■ The defendant's four-day career in banditry afforded him his reason, deplorable though it was, for taking the life of Sergeant Chambers. Had the defendant not engaged in his carnival of crime, he would not have shot the officers. We observe that the appellant's brief engages in the thought: "Perhaps Duffy and Bailey had determined to disarm the officers as they came into the basement, as they did the Nampa police two days before." In any event, the state was entitled to place before the jury evidence which seemingly accounted for the defendant's motive.

The instructions to the jury upon the subject of motive are complete, are not criticized by the appellant

and, in our opinion, accurately portrayed the law. We are satisfied that the first and second assignments of error lack merit.

The third assignment of error is based upon the ruling which received in evidence the statement written by officer Snider, and signed by the defendant, which we quoted in a preceding paragraph. The fourth assignment of error is predicated upon a contention that that entire statement was not admissible in any event, and that further error was committed when the trial judge refused to restrict its admissibility to only "the portions thereof pertaining to the crime charged, as requested by Defendant." Since the appellant argues these two assignments of error jointly, we shall consider them together.

The appellant does not contend that the statement which he signed was not freely and voluntarily made, but says: "A trial court must not permit the State to influence the jury in favor of capital punishment through receipt in evidence of other criminal offenses committed by defendant." He cites: *Boyd v. United States,* supra; *United States v. Dressler,* 112 Fed. (2d) 972; *People v. Lane,* 300 Ill. 422, 133 N. E. 267; *People v. Heffernan,* 312 Ill. 66, 143 N. E. 411; and *People v. Meisner,* 311 Ill. 40, 142 N. E. 482.

The Lane decision says:

"These other crimes were not connected in any way with the charges in the indictment. They were committed at other times and different places and were irrelevant to the issue and incompetent to be shown on the trial of this charge."

In the Meisner decision, we find:

"All this evidence was incompetent and had nothing to do with the murder of Schlessinger, for

which the defendants were on trial. The crap game Sunday night, the proceedings of the defendants and Splitt and Myers on Monday and Monday night, the two holdups that night, and the burglary of the saloon, were entirely disconnected with the murder which Meisner committed. * * * No one of the crimes had any tendency to throw any light on the one which was the subject of investigation on this trial."

In the Heffernan case the court said:

"There might arise cases of murder in which the proof of other crimes, and even the details thereof, might be admissible in evidence * * *. It is also true that there may be such a connection between two criminal acts as to render proof of both crimes competent, and sometimes the proof of a former crime or other crimes may be competent to prove motive."

In the Boyd decision, the court recognized that evidence showing the accused's commission of other crimes is at times admissible. We quote from the decision:

"If the evidence as to crimes committed by the defendants, other than the murder of Dansby, had been limited to the robberies of Rigsby and Taylor, it may be, in view of the peculiar circumstances disclosed by the record, and the specific directions by the court as to the purpose for which the proof of those two robberies might be considered, that the judgment would not be disturbed, * * *. But we are constrained to hold that the evidence as to the Brinson, Mode and Hall robberies"

was immaterial to any issue in the case. In the Dressler case, the defendant's criminal record inadvertently was sent to the jury room. It, of course, was inadmissible for any purpose and the sole issue was whether

a motion for a new trial was the proper method of dealing with the situation.

■■ In this case, the jury passed, not only upon the issue as to the defendant's guilt or innocence, but, upon finding him guilty, also determined whether he should be executed or be confined for his life in our penitentiary. In view of the second issue, it was peculiarly the duty of the trial judge to keep from the jurors' ears all immaterial evidence tending to show that the defendant was a miscreant whose life was not worth saving. But that duty did not mean that the trial judge should also exclude material evidence merely because it attributed to the defendant the commission of other wrongs. If the exclusionary rule went that far, then error was committed when evidence was received which showed that the defendant shot O'Brien. In fact, if the rule shut out all evidence showing other crimes, then the state should have been permitted to offer evidence only as to the shot which killed Chambers, for the firing of all the other shots were crimes. In truth, if the rule goes as far as appellant's counsel says, then the trial judge should have excluded evidence that the defendant was in the basement, for the defendant had unlawfully entered the structure. The cases upon which the appellant relies do not employ any rule which excludes material evidence. They merely hold that evidence which is otherwise immaterial becomes prejudicial in cases wherein the jury is concerned with the penalty, if it tends to show that the defendant is a character whose life is virtually worthless. We observe that the trial judge took the precaution of instructing the jury as follows:

"There has been some evidence in this case of other crimes committed by the defendant and there-

fore I instruct you that the defendant is not charged with, and is not on trial for the commission of any offense except the charge of murder in the first degree set out in this indictment and, therefore, if you should believe that the defendant was guilty of or had assisted in the commission of other offenses, those would not and should not in any manner justify a conviction of the defendant unless you should find beyond reasonable doubt that he was guilty of the offense of murder in the first degree or one of the lesser crimes of which I have instructed you.''

The evidence challenged by the appellant was material and admissible for the reasons we have already developed. We conclude that the third and fourth assignments of error are without merit.

■ The fifth, sixth, seventh and eighth assignments of error deal with the law of arrest and are presented by the appellant under a single head. Each of the four is based upon an instruction requested by the appellant, which was not given. These requested instructions are as follows:

"You are further instructed that it is the law of the State of Oregon that when arresting a person without a warrant, the officer must first inform him of his authority and the cause of the arrest, except when he is in the actual commission of a crime, or is pursued immediately after its commission, or on escape.''

"You are instructed that an attempt to make an arrest without a warrant under any other circumstances than I have outlined to you is unlawful and may be resisted with force by the person sought to be arrested, but no more force can be used by the person sought to be arrested than is necessary to prevent the arrest.''

"You are instructed that probable cause is the existence of circumstances calculated to lead a reasonably prudent person to believe in the guilt of the accused party, but a belief unsupported by facts or circumstances will not justify an officer in making an arrest without a warrant."

"You are instructed that though you may find and believe from the evidence that officers Chambers and O'Brien had information from a creditable source that would cause them to believe as reasonable men that the defendant herein had committed a felony, and though you believe said officers had a lawful right at said time to arrest the defendant, yet if you find and believe from the evidence that the power to arrest, was, by them, or either of them executed in such a wanton and menacing manner as to threaten the defendant with loss of life or some serious bodily harm, then you are instructed that the defendant had the right to defend himself from such danger or apparent danger as it reasonably appeared to him viewed from his standpoint."

"The court instructs the jury that the law gives to every man the right of self-defense. This means that, if a man is assaulted, he may defend his life or person from great bodily harm. He may repel force by force and he may resort to such force as under the circumstances surrounding him may be reasonably necessary to repel that kind of harm, even to the taking of the life of his adversary. If, then, you should find in the consideration of this case the defendant honestly believed that he was then and there in danger of death or great bodily harm, he would be justified in defending himself even to the extent of taking the life of his adversary."

The instructions given to the jury unfold at length the law of arrest. They delineate in detail the circumstances under which an officer, including a member of

the Oregon State Police, is authorized to make an arrest without a warrant. The defendant took no exception to them and they are not criticized in his brief.

We are satisfied that the second, third, fourth and fifth requested instructions were foreign to the situation disclosed by the evidence. Sergeant Chambers, the victim of the alleged crime, wore his uniform when he entered the basement and when his life was taken. The only evidence that was given upon the subject indicates that when he approached closet 3 the door suddenly flew open and Duffy greeted Chambers with a profane epithet, adding, "You will never take us." At the same moment he fired upon Chambers. So far no opportunity had been afforded the officers to explain why they had come or to display a warrant had they had one. In the meantime, none of the officers was aware of the presence of the defendant in the coal bin which he deemed a hideout. Had they wished to speak to him concerning the stolen car or upon any other subject, they would not have known that they could find him in his hideout. The first time that any of the officers became advised of the defendant's presence in the coal bin was when a shot rang out and O'Brien fell wounded to the floor. He had been shot in the back by a bullet fired by the defendant from his hideout. After Saunders saw O'Brien fall he observed the defendant's hand, holding a gun, protruding through the door of the coal bin. Surely it was not necessary at that juncture for the officers to approach the defendant with a warrant of arrest and, in the absence of one, to withdraw from the schoolhouse. Shortly Saunders saw Chambers creeping on the floor toward the scant protection afforded by some benches. His back was toward the defendant. Then he saw the

defendant fire three times at Chambers. At that moment Chambers slumped over dead. Since the purpose of instructions is to give the jury the law pertinent to the issues, the second, third, fourth and fifth requests, which are quoted above, were properly refused. The essence of the first was given to the jury in language which the appellant does not criticize. These assignments of error, we are satisfied, are without merit.

■■ The ninth assignment of error is based upon a ruling which was made by the trial judge during the course of the district attorney's argument to the jury. The district attorney was proceeding to say:

"Do you believe for a minute it would be necessary for these officers, after Sergeant Chambers had been killed, for them to run clear into Ontario, or the nearest Justice of the Peace to get a warrant to arrest these people for killing this man?"

When he had got that far defendant's counsel interrupted with the remark, "Those statements are unwarranted." The trial judge declared: "That will be left up to the jury. They have heard the argument."

The above appears to be only a fragment of the district attorney's argument. We assume that the defendant's counsel also presented an argument. Whether the above was in retaliation for something that the defendant's counsel had said, we do not know, but since he handed to the trial judge the above-quoted extensive instructions concerning the law of arrest, we assume that he said something to the jury concerning the rights of the officers when they were in the basement. From 64 C. J., Trial, § 307, we quote:

"Each case of misconduct must, of necessity, be decided on its own merits, much depending on the

issues, the parties and the general atmosphere of the case. It being for the court to control the arguments and conduct of counsel, what should be done to correct misconduct is a matter for the sound discretion of the court.''

Although it would have been better had the trial judge advised the jury that no warrant was necessary to justify the defendant's arrest after Sergeant Chambers had been killed, and that there was no issue before them upon that subject, yet we can not see how the appellant was prejudiced when the trial judge ruled: ''That will be left up to the jury.'' It will be recalled that the trial judge added: ''They have heard the argument.'' The latter remark implies that the subject had been touched upon by both parties. We see no occasion for holding that this assignment of error presents merit.

The above disposes of every contention advanced by the appellant. The judgment of the circuit court is affirmed.