Argued January 23, affirmed May 21, 1952

# STATE OF OREGON *v.* LONG
### 244 P. 2d 1033

*Ashley Greene,* of Portland, and *Dale Jacobs,* of Oregon City, argued the cause and filed a brief for appellant.

*Leonard I. Lindas,* District Attorney, and *Winston L. Bradshaw,* Deputy District Attorney, both of Oregon City, argued the cause for respondent. On the brief was George Neuner, Attorney General.

BRAND, C. J.

The defendant Wayne LeRoy Long was tried upon the charge of murder in the first degree. He was found "guilty as charged in the indictment", without recommendation, and was sentenced to death. The indictment reads in part as follows:

"The said WAYNE LE ROY LONG on or about the 15th day of June, A. D., 1950, in the said County of Clackamas and State of Oregon, then and there being, did then and there unlawfully and feloniously, purposely and of deliberate and premeditated mal-

ice, kill one, Walter Lane Rucker, by shooting the said Walter Lane Rucker with a gun * * *.''

The defendant now appeals and presents nine assignments of error. Before reviewing the evidence received and the rulings made at the trial, we will consider two assignments of error which relate to preliminary motions. On the first day of the trial, but before the examination of the prospective jurors, the defendant moved for a continuance ''on the grounds that the defendant is not in the custody of the State of Oregon.'' The defendant offered to show ''by the testimony of the District Attorney, the Sheriff of this county, the United States District Attorney, and the United States Marshal that this man is in the custody of the Federal Government'' and that he was being held awaiting trial upon a federal charge. It was argued that producing the defendant in the state court under these circumstances was a violation of his rights under the federal and state constitutions. However, counsel for the defendant also stated that the defendant had been brought ''on a letter written by the District Attorney to the United States District Attorney requesting that he be produced'', and he conceded further ''that the prisoner is here with the consent of the United States District Attorney for this district''. He disavowed any ''contention that the prisoner has been deprived of an opportunity to prepare his defense by virtue of the fact that he has been in the custody of the United States Government before production here''. The District Attorney stated to the court that the prisoner had been surrendered and was in the physical custody of the state. He said, ''They have voluntarily brought in the prisoner to us for trial and we have the sole custody of him.'' No further reference was

made to any offer to take testimony and no witness was called to testify. The motion for a continuance was denied. Upon this issue the following cases were cited by the defendant: *Chapman v. Scott,* 10 F2d 156, affirmed 10 F2d 690, and *Ponzi v. Fessenden,* 258 US 254, 66 L ed 607. In both cases a defendant who was serving his sentence on conviction in a federal court was surrendered by the federal authorities to a state court for trial upon a different charge. From the opinion in the District Court we quote the following:

" * * * Courts of criminal jurisdiction need not inquire how the prisoner at the bar came within the reach of their mandates; for jurisdictional purposes it is sufficient that he is there. * * *
" * * * * * *

"But the relator is not the federal government, nor is he authorized to move on its behalf, nor will the court be keen to discover a technique for the subversion of justice; it will not interpose its arm to circumvent a lawful doom. It is a fundamental rule that our system of state and federal jurisdiction requires a spirit of reciprocal comity between courts to promote due and orderly procedure, and the facts disclosed by this record and clearly established show conclusively that the spirit of reciprocal comity has been fully met in this instance, and that due and orderly procedure has resulted. We must not overlook the fact that to all the proceedings had in the state court, resulting in the relator's conviction of murder in the first degree, the United States, through its duly authorized agents and representatives, acquiesced in those proceedings, and temporarily surrendered its possession of the relator to the state authorities, and, having done this, the relator can have no legal complaint, as the situation is squarely within the rule stated by Chief Justice Taft in Ponzi v. Fessenden, 258 U. S. 254, 42 S. Ct. 309, 66 L. Ed. 607, 22 A. L. R. 879. * * *" *Chapman v. Scott,* supra, 10 F2d 156, 159, 161.

The judgment was affirmed in the Circuit Court of Appeals. (2d Cir 1926.) That court said:

" * * * How he came within the jurisdiction of the Connecticut court, in the absence of objection by the United States, is not important or material; it is sufficient that he is there. He was lawfully within the jurisdiction of the Connecticut court, and it had the power, under the custody granted, to try and punish him upon conviction." *Chapman v. Scott,* supra, 10 F2d 690, 691.

In *Ponzi v. Fessenden,* supra, 258 US 254, 66 L ed 607, 611, the Supreme Court said:

"One accused of crime has a right to a full and fair trial according to the law of the government whose sovereignty he is alleged to have offended, but he has no more than that. He should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial. He may not complain if one sovereignty waives its strict right to exclusive custody of him for vindication of its laws in order that the other may also subject him to conviction of crime against it * * * ."

See also *United States v. Farrell,* 87 F2d 957.

■ The defendant claims that the cited cases are distinguishable because, in both instances, the defendant had been tried and convicted by the federal court before being surrendered to the state court for trial, whereas, in the case at bar the defendant was being held for trial by the federal authorities. It is argued that the defendant had a right to a speedy trial on the federal charge. It may be answered that he also had the same right on the state charge of murder in the first degree. The principles announced in the Chapman and Ponzi cases are equally controlling here.

*Smith v. Swope,* 91 F2d 260; *State v. Simmons,* 39 Kan 262, 18 P 177; and *In re Robinson,* 29 Neb 135, 45 NW 267, are cited but are not in point. There is no merit in the first assignment of error.

The second assignment is as follows:

"The court erred in denying motion to dismiss the venire and continue the cause on the ground that defendant had been shackled in the presence of the entire panel."

The question was presented before the examination of the jurors on their voir dire, and in the following manner. We quote from the statement of defense counsel made at that time:

" * * * We understand that this man is regarded by the authorities as a dangerous man, and he is continually surrounded by guards. Any show that that is being done in the presence of the jury is obviously prejudicial. When we attempted to leave from the court room, a number of men, the Deputy Sheriff and the Deputy Marshall, physically handcuffed him in the presence of all the members of the jury. It has been held by the State of Oregon that bringing a man in with shackles is in violation of his Constitutional rights. We would like to take exception to that in this particular controversy [controversy] to move that this panel be dismissed and that another panel will be called."

No evidence was offered or received concerning the alleged circumstances. The court then made suitable arrangements to insure that the prisoner should not be handcuffed during the proceedings in court. It was also provided that only one guard should be in uniform and that all others should be in plain clothes. It was further provided by the court that whenever it should be necessary that the defendant be brought

into chambers, the guards were to wait until the jury had retired, after which, handcuffs were to be placed upon the defendant. Our subsequent review of the evidence will disclose reasonable grounds for the precautions which were taken. No testimony was offered or received concerning the alleged appearance of the defendant in handcuffs before the venire or at any other time. It does not even appear whether the condition of the defendant was apparent or was observed by any of the prospective jurors. Thereafter the jurors were examined as to their qualifications by the prosecution and defense. At that time the defense had ample opportunity to inquire and to excuse any disqualified juror. The examination of the jurors has not been reported. The record fails to show any objection to any ruling as to the qualification of any juror and the trial jury was ultimately accepted and sworn without objection.

In an excess of caution, this being a capital case, we will examine the authorities cited by the defense upon this assignment of error.

In *State v. Smith*, 11 Or 205 (1883) a conviction was reversed because of insufficiency of the indictment and also because the defendant was kept with irons on his feet during the trial. In fact, he was "so heavily ironed" that it would have required a blacksmith to remove them. Motion was made to have the irons removed, which the court denied. The ruling in that case bears no resemblance to the careful ruling of the court in the case at bar when the matter was first called to his attention before the commencement of the trial.

In *Eaddy v. People*, 115 Colo 488, 174 P2d 717, the defendant, on trial for murder, was compelled to

appear at his trial in striped coveralls with the words "County Jail" written in large letters across the back. Objection was duly made and was overruled by the court. This was held to be an abuse of judicial discretion. The case is clearly distinguishable. In that case the court reviewed the authorities concerning the alleged right of a defendant to be free from shackles at his trial. The rule and the reasons for it were set forth as follows:

" * * * The right of a prisoner undergoing trial to be free from shackles, unless shown to be a desperate character whose restraint is necessary to the safety and quiet of the trial, is Hornbook law. The reasons given are: 'That his mind should not be disturbed by any uneasiness his body or limb should be under.' State v. Temple, 194 Mo. 237, 92 S. W. 869, 872, in which the author of the opinion states and quotes from Rex v Layer, 16 How. St. Tr. 94: that such restraint upon a prisoner 'inevitably tends to confuse and embarrass his mental faculties, and thereby materially to abridge and prejudicially affect his constitutional rights of defense;' citing People v. Harrington, 42 Cal. 165, 10 Am. Rep. 296, and that, 'A prejudice might be created in the minds of the jury against a prisoner who should be brought before them handcuffed and shackled, which might interfere with a fair and just decision of the question of the guilt or innocence of such prisoner.' "

In *Hall v. State,* 199 Ind 492, 159 NE 420, the defendant was brought into court handcuffed and with ankle irons. The defendant moved for an order directing the removal of both. The court allowed the motion as to the handcuffs but denied it as to the ankle irons. On appeal the Supreme Court said:

" * * * But, where the trial court has good reason to believe that the defendant is a desparate

and dangerous criminal, and that there is serious danger of his harming those about him in the courtroom, or of his attempting to escape or being released by others, it may exercise its sound and enlightened discretion, and order him restrained in such reasonable manner as it deems necessary (see cases cited in 16 C. J. 819; 8 R. C. L. 68; note, 5 Ann Cas. 959; note, 39 L. R. A. 821), and the action of the court in so doing will not be error, unless there has been a clear abuse of discretion * * *.''

The court also said:

"Appellant's contention that the knowledge upon which a court bases its discretion to refuse a prisoner's request that fetters be removed from his legs must come only from evidence offered at the trial does not appear to us to be sound. * * *"

In *State v. McKay*, 63 Nev 118, 165 P2d 389, the right of a defendant to be free from shackles at his trial was first recognized as the general rule. The court then said:

" * * * Permitting a defendant to be shackled during his trial is legally justifiable only upon the trial court having found, in the exercise of its *judicial* discretion, in the particular case, the existence of the exceptional conditions, of fact and circumstance, reasonably rendering necessary a departure from this wholesome and salutary general rule against shackling and manacling.

"It has been held, however, and we believe generally conceded, that a sheriff, charged with the responsibility of safely keeping a person, has the right, in his discretion, to handcuff one charged with murder or other felonious crime when he is being taken from and to the court. Donehy & Prather v. Com., 170 Ky. 474, 186 S. W. 161, 3 A. L. R. 1161.

" * * * * * *

"It has been repeatedly held, in effect, that, upon a motion to remove shackles or handcuffs from

a defendant, the court has the right to take into consideration knowledge acquired outside of formal evidence offered and admitted at the trial. * * * " (Italics ours.)

It was held that there was no abuse of discretion in the order denying defendant's motion for the removal of the handcuffs.

■ In *Shultz v. State,* 131 Fla 757, 179 S 764, there is a dictum to the effect that it is improper to bring a person who has not been convicted of crime, clothed as a convict and bound in chains, into the presence of a venire or jury by whom he has to be tried. The court said that when such condition is shown by the record "it might be sufficient ground for a reversal." In that case, as in the one at bar, the condition was not shown by any testimony, but only by the motion of the defendant. The case was reversed upon other grounds. The second assignment of error is without merit. Our conclusion is supported by the following cases: *Marion v. Commonwealth,* 269 Ky 729, 108 SW2d 721; *Seadlund v. United States,* 97 F2d 742; *Stockton v. State,* 148 Tex Cr R 360, 187 SW2d 86; *Corey v. State,* 126 Conn 41, 9 A2d 283.

It is asserted that the court erred in permitting the district attorney to state in his opening and closing arguments that the defendant had been an inmate of the Oregon State Penitentiary. In his opening statement, the district attorney said that the defendant "while an inmate of an Oregon institution, conceived and formulated — — —". At this point counsel for the defendant objected to the statement "as referring to the fact that this man has been an inmate of the Penitentiary * * *." Thus the fact of incarceration in the penitentiary was introduced by the defendant. Thereafter the prosecution also referred to the release

of the defendant from the penitentiary. The district attorney also referred to the circumstances concerning a bank robbery committed by the defendant, which is assigned as error. It is also asserted that "The Court erred in admitting evidence of the shooting of an FBI agent subsequent to the homicide." There is also a "shot gun" assignment of error which reads as follows: "The Court erred in admitting evidence and permitting the District Attorney to make statements with reference to other crimes and criminals, and in denying a mistrial at the close of the opening statement." The assignments of error based on rulings of the trial court concerning the statements of the prosecution rest upon the assumption that matters related by him and introduced into evidence were inadmissible. The admissibility of the evidence on which the prosecution commented can only be ascertained by a careful review of the entire case. If it be found that the evidence was admissible, then we must hold that there was no error in the remarks concerning that evidence made by the district attorney.

In the course of our consideration of the evidence, we direct attention to four crucial issues: In view of the situation presented to the court, (1) was there reversible error in admitting evidence that the defendant had been in the penitentiary, or (2) in admitting evidence of the robbery of a bank by the defendant, or (3) in admitting evidence that the defendant shot an FBI agent in connection with the bank robbery, or (4) in permitting evidence of the relationship between the defendant and one Purnell, alias Pendleton, or between the defendant and one Omar Pinson? Defendant also contends that the evidence was solely circumstantial, was insufficient to warrant conviction, and more specifically, that there was no evidence of

premeditation. The issues thus presented require a review of the relevant evidence. In determining the sufficiency of the evidence we are bound by the rule as stated in our decisions that circumstantial evidence, to be sufficient for conviction, must be of a conclusive nature and that mere suspicion or mere probability is not sufficient. Under that rule the state was not only permitted but was required to do more than prove the probability of guilt. It was entitled to present additional evidence fortifying its case and removing all possible elements which might give rise to reasonable doubts. *State v. Dennis,* 177 Or 73, 159 P2d 838, 161 P2d 670.

We turn to the evidence. Upon the close of the state's case, the defendant rested without the introduction of any testimony or evidence.

The undisputed evidence shows that the defendant was released from the Oregon State Penitenitary on 14 June 1950 at 9 a. m. At some time after 10 o'clock p. m. of the same day, in the city of Portland, he entered into a conversation with Walter Rucker, the driver of a Ford pickup truck. Both entered the truck and drove away. At about 6:15 a. m. on the next day the defendant was driving the Ford pickup truck. He was alone. At about 9:45 of the same day he drove to the immediate vicinity of the First National Bank, which is located on the northeast corner of 82nd Street and Foster Road. He entered the bank. Shortly thereafter he came out of the bank with a Reising rifle in one hand and shopping bags in the other. An agent of the Federal Bureau of Investigation ordered him to stop. The defendant shot the officer and ran for Rucker's pickup truck, but was shot down and captured by other agents of the FBI. At 3 p. m. on the same day, the body of Rucker was found in a clearing near Eagle Fern

Park in an isolated part of Clackamas county. There was a bullet hole in his head. From the release of the defendant at the penitentiary to the moment of his capture, 25 hours had elapsed.

The evidence is to the effect that the defendant was followed by agents of the FBI from the moment of his release at the penitentiary until his capture outside of the bank, with the exception of a certain period of time during which the officers lost track of him. How was it possible for the prosecution to reconstruct, for the benefit of the jury, the strange and violent events which were crowded into this brief period of time? How did it transpire that there were witnesses who followed the defendant from the penitentiary gates to the final burst of gunfire outside the bank? How was it possible for the defendant, who certainly was not furnished with arms by the warden on his release from the penitentiary, to secure an improvised 45 caliber submachine gun and a 45 caliber automatic, with ammunition for both, without purchasing them, and within a very few hours of his release? How, and why, did he acquire the Ford pickup truck? What, if any, motive did he have for the murder of Walter Rucker? And what light is thrown upon the case by the evidence of the bank robbery? Without the presentation of some reasonable explanation, these matters must have remained an enigma in the minds of the jury. Events, such as have been briefly related, do not ordinarily occur, nor are they often observed and recorded as they occur. The jury was entitled to an explanation which would take these bizarre facts out of the realm of mystery, coincidence and doubt, and produce conviction. Such an explanation, the prosecution undertook to present. The state conceded that the evidence which binds together all of these events and arranges them

in logical sequence, also unavoidably discloses the commission of other crimes committed by the defendant, in addition to that of murder, but it contends that those very crimes form a part of a single web of fact which must be considered as a whole if a rational conclusion was to be reached as to guilt in the pending case.

Maps were introduced in evidence showing the area within which the events transpired. The undisputed evidence establishes the following facts: The Oregon State Penitentiary is adjacent to the east boundary of the city of Salem. At 9 a. m. on 14 June 1950 the defendant emerged from the front gate at the penitentiary, entered a car, and was driven north to Portland, a distance of about 50 miles. Two special agents of the FBI, Peter J. Meaney and Max E. Taylor, followed him from the penitentiary. The reason for the surveillance remained unexplained until the cross-examination of the witness Taylor by defense counsel. The witness was then asked:

"Q Will you tell the jury why you were following Mr. Long?

"A At that time we had a warrant outstanding for Omar August Pinson, charging him with unlawful flight to avoid confinement for the crime of murder. The information had come to us that Long and Pinson were quite friendly in the penitentiary, and it was thought that Long would probably lead us to Pinson."

■■ This disposes of one of the assignments of alleged error. The defendant cannot complain of the evidence concerning the friendly relationship between the defendant and the convict Omar Pinson, nor can he complain of the evidence showing the reasons for the surveillance of the defendant Long by the FBI. The facts were deliberately brought out by the defendant's

own counsel. Furthermore, the failure to give any logical explanation for the unusual procedure of the officers would have cast doubt upon their narrative. The record of the defendant's actions during the remainder of the 14th day of April is established by unchallenged and undisputed evidence. His conduct was marked by stealth, and indicates the existence of some plan which was conceived before he ever saw Walter Rucker, the deceased. The state contends, and the evidence tends to show, that this over-all plan was to equip himself for an intended successful bank robbery and escape.

The defendant, followed by agents of the FBI, was driven from Salem to the intersection of Milwaukie Avenue and Bybee Boulevard, in the city of Portland. At that point he left the automobile and boarded a bus and rode 20 or more blocks to the intersection of Milwaukie Avenue and Powell Boulevard where he left the bus and walked easterly several blocks on Powell to 21st Street, still followed by the officers using binoculars. Defendant then boarded a Powell bus and rode southeasterly to the end of the line at 82nd Street and Johnson Creek. At this point defendant left the bus. He was then close to the south boundary of the city of Portland, at a point some 60 blocks east and 30-odd blocks south of 21st and Powell. Defendant entered a tavern, then walked south on 82nd Street to a bridge, then turned around and walked north several blocks on 82nd to the corner of 82nd and Flavel Streets, then went west on Flavel Street past the intersection of 69th to about 63rd, where he entered a small grocery store. The testimony of officer Taylor and of the grocer shows that he attempted to secure a shopping bag, but the one available was not large enough for the defendant. Defendant asked where 69th Avenue was. Defendant, still followed by the officers, then walked

east on Flavel to 69th, where he turned north. He was carrying nothing. At that point the officers lost sight of defendant for about half an hour. He then reappeared in the same area at about 1:30 p. m., carrying a shopping bag in his right hand and a long paper-wrapped bundle under his left arm. Mrs. Salzwedel resided on 69th Avenue, just north of Flavel. The defendant came to her house at about one o'clock and asked for Mrs. Salzwedel. As a witness, she testified, without objection, that the defendant asked her if she remembered Everett Pendleton. She answered in the affirmative. The true name of Pendleton was Purnell, who was at the time in the penitentiary. The defendant then told the witness that "he was a cousin of his and that Everett had left some things in the trunk, and he was going to work in Portland and Everett had told him that he could take them from the trunk." Two trunks belonging to Purnell, alias Pendleton, were in the basement of the Salzwedel home. The two trunks were numbered 1 and 2. The defendant said "he wanted into" the no. 1 trunk. The witness identified the defendant, described his clothes and hat and identified a picture of Everett Pendleton, saying:

"A That person we knew as Everett Pendleton.

"Q That is a picture of Everett Pendleton?
"A Yes, as we knew him."

The witness accompanied the defendant to the basement. Defendant then produced two hacksaw blades (exhibit 20) and started sawing off the lock. He opened the trunk and removed a black package which the witness described as follows:

"A * * * it was about this long (illustrating), and one end, I would say, was about like that and the other was smaller, and it was tied with either a heavy twine or a light rope."

Defendant stated there was a small box in the trunk, and upon searching, he found one wrapped with a deep orange and white checkered oil cloth. He looked through a corner of the box and said it was the one he wanted. The witness positively identified the oil cloth (exhibit 24) and stated that a pasteboard carton (exhibit 26) which measured 7x7x8 inches, was the approximate size of the package which the defendant took from the trunk. Defendant told the witness that Pendleton was in California working in a garage. Defendant also took from the trunk an alarm clock, some pasteboard boxes and a sawed-off end of a gun. The gun butt was returned to the trunk where it remained until the agents of the FBI came and removed it. Defendant asked the witness for "one of these extra long shopping bags." She had none, but gave him two regular sized bags, one inside the other. She identified them and they are in evidence as exhibit 23. The defendant put the oil cloth-covered box in the shopping bag and wrapped the black package in newspaper.

In order more closely and conclusively to weld the links of circumstantial evidence, the prosecution was entitled to show how it came about that the defendant knew of the trunk and its contents, and why he desired access to it. The defense had already, by cross-examination, brought out the fact that the defendant had been in the penitentiary. The state then introduced evidence of a guard lieutenant at the penitentiary. It was shown that Purnell had been in the penitentiary from June 1947 to the date of the trial. During the year 1950 the defendant and Purnell were always together in the exercise yard. Purnell had left the trunks at the home of Mrs. Salzwedel. On cross-examination the defense inquired concerning the location of Omar Pin-

son, a matter on which the state had made no inquiry. The answer was, that at the time of the trial of the pending case, Pinson was in the Oregon Penitentiary. The defendant, after his arrest, admitted that he got a rifle and automatic, without difficulty, in a trunk in the basement of a house located in the vicinity of 68th and S. E. Flavel, and that he had told the lady of the house that he was a cousin of Everett Pendleton and that Pendleton had given him permission to get some tools from the trunk. The evidence was received without objection.

Upon emerging from the Salzwedel house, the defendant, carrying the bundle and the shopping bags, walked east on Flavel to 82nd. He then walked north on 82nd and entered the Bungalow Courtel. Shortly thereafter he emerged and walked to the O. K. Rubber Welders, a short distance from the courtel, and on 82nd. He remained there a few minutes, then proceeded north on 82nd. When he left the rubber welders, he had neither the shopping bag nor the package. Defendant then continued north on 82nd to the Bybee Tavern, then crossed to the west side of 82nd and entered a trailer camp. This was at about 1:45 or 2 p. m. Defendant then returned to the O. K. Welders a second time.

The witness Hart was the operator of the trailer camp at southeast 82nd and Bybee. Defendant asked Hart for a place in which to stay for the night. Hart informed him that he had no place and said, "Why don't you go to a hotel or auto court?", and the defendant said, "I couldn't find anything". Ultimately Hart rented the defendant a trailer at about the hour of three p. m. Shortly thereafter, special agent Rice of the FBI came to Mr. Hart and inquired concerning the defendant. Hart went to the trailer and asked the defendant if he could come in. The defendant said,

"No". Hart informed the defendant that he had a party who wished to inspect the trailer which was for sale. The defendant told Hart to come back in half an hour, at which time he would be out. Officer Rice testified that at about dusk the defendant came out of the trailer house carrying bundles. Rice then contacted Hart and examined the trailer house and the garbage disposal area of the camp. In the latter place he found exhibit 24, the orange and white checkered oil cloth which was identified by Mrs. Salzwedel as the wrapping of the box taken from the trunk. When the defendant returned to the trailer court he was carrying a package. Witness Hart stated that:

"A He had a package, holding it on the side of him. It looked like it was sliding down and he would pull it up again.

"Q Do you know what kind of package it was?

"A A paper bag.

"Q Do you know what was in the bag?

"A I saw a part of it when the paper broke. I saw a gun sticking out of there."

The only objects found in the trailer itself were "little parts that it looked like he cleaned the gun with." The defendant later admitted to agent Rice that he had cleaned the rifle and the automatic on the afternoon of the 14th. Agents Meaney and Taylor saw the defendant leaving the trailer court at about 9:40 p. m., at which time he was carrying the shopping bag. At 9:45 p. m. agent Hanson saw the defendant near the trailer court, still carrying the shopping bag, in which was an object "which appeared not to fit the bag, longer than the bag, apparently wrapped." Still under surveillance, the defendant walked at least two miles southerly on 82nd Street and into Clackamas county, which lies south of Multnomah county and the city

of Portland. Defendant was walking on the east side of the street. He then crossed over to the west side and went onto the lawn of a house, occupied by one Nutting. He approached a car which was parked in front of the house, looked in the front part of it, and returned to the street. He continued south and then reversed his direction and went northerly until he reached a Mobile gas station. There he approached a pickup truck which was faced northerly, spoke to the driver and then entered the truck by the right front door. He was still carrying the shopping bag with the protruding object. The number on a Washington license plate on the truck was "T" "a" 21863. The truck, followed by the officer, was driven north on 82nd Street, but shortly made a U turn and continued south. The pickup truck with the defendant and the driver continued through Clackamas to the town of Gladstone. The truck stopped at a gas station. Witness Bauer, the operator of the gas station, identified the defendant as the man who was sitting on the right-hand side of the driver. He was shown exhibit 3, a photograph of Walter L. Rucker, and stated that it was a picture of the driver of the truck. Bauer attempted to open the right-hand door of the truck to inquire concerning the amount of gas desired. The door was locked. The defendant said, "Fill it up." Bauer put in "something beyond 17 gallons" of gas. The truck was not in need of oil, but the driver said to put it in. Bauer testified:

"A * * * there was some garment or some covering over the party's feet, over the knees, and it kind of struck me funny during the time why it should be done. It wasn't very cold at the time, and it seemed funny at that time. Other than that, I didn't see anything.

"Q This man who had the garment, who was covered, is that the man seated there?

"A That's right."

He testified:

"Q Do you know whether or not the blanket was spread entirely across the front seat?

"A It was spread over himself more.

"Q Just over one of the persons?

"A Yes, it was over one of the persons, but it was entirely over him."

Bauer testified that defendant had "kind of a funny look on his face." A few minutes later the truck pulled out and officers of the FBI pulled in. The truck continued for a short distance and then turned east off of the Pacific highway at the northern outskirts of Oregon City.

In order to understand the testimony of the next witness, Janoushek, it is necessary to consult the map, exhibit 1. The map shows that from Oregon City, at approximately the point where the defendant and Rucker turned to the east, a road runs easterly through Redland and Logan, and thence southeasterly to Estacada, which city lies about 13 miles east and three or four miles south of Oregon City. Eagle Fern Park where the body of Rucker was found, lies northeasterly from Estacada about three miles. Following this route, the defendant could have reached Eagle Fern Park on the night of the 14th. Another road leaves 82nd Street at Clackamas and runs southeasterly, following the general course of the Clackamas river, and continuing through Carver, Barton and Eagle Creek. The road then forks, one branch going south to Estacada and the other, the main road, going southeasterly along the general course of Eagle Creek to and through

Eagle Fern Park. Witness Janoushek, a truck driver, left Portland in the early morning of 15 June. His destination was a point 30 miles north of Estacada. Following the road along the Clackamas river, he reached the town of Eagle Creek at about 5:30 a. m. Shortly after leaving Eagle Creek the road makes a sharp left-hand and then a sharp right-hand turn. As he was making the right-hand turn he met a light-colored pickup truck coming from the direction of Estacada. The pickup was on the wrong side of the road. It resembled the one shown in exhibit 32, a photograph of the Rucker truck.

At 6:30 a. m., special agent Kurtz of the FBI saw the defendant driving alone in the Ford pickup truck and traveling north toward Portland. The testimony of the various witnesses is sufficient to permit a reasonable inference that the defendant, on the night of the 14th or early morning of the 15th, was in the vicinity of the spot where the body of Rucker was found. Officer Kurtz followed the defendant as they drove into Portland. The defendant was driving, apparently aimlessly, but was occasionally stopping and starting the truck without leaving it. There is evidence that the defendant was not accustomed to driving.

On the morning of the 15th at about the hour of 7:30, officer Hanson saw the defendant in the vicinity of southeast 82nd and Foster Road. The defendant was alone and was driving the Rucker truck. Defendant drove around for about a half an hour through the southeast portion of the city of Portland. The witness last saw the defendant sitting in the Rucker truck at the Salzwedel home. FBI special agent Deaderick saw the defendant in the truck at the house and kept him in observation until about ten minutes of ten. The defendant drove around a little and went to Foster Road. He

turned east on Foster Road, crossed 82nd Street and continued on for two blocks, then swung around and returned to 82nd and Foster Road and parked the pickup truck on Foster Road headed west. Defendant got out of the truck and went into the Fred Meyer store on Foster Road. In two or three minutes he returned to the truck and picked up a shopping bag with the protruding object therein. He then walked east on Foster Road, across 82nd Street, and into a bank on the corner where he "remained a couple of minutes." From the testimony of officer Deaderick we quote:

"A He came out of the bank.

"Q And will you continue? What occurred from that point on, now?

"A When he came out of the bank, he had in his hand a gun——".

At this point defense counsel objected "to any further testimony along this line." The objection was overruled. It will be observed that the objection was not made to the testimony last quoted, nor was there a motion to strike. In this case, and throughout the transcript of testimony, counsel for the defendant followed the practice of waiting until a question had been asked and an answer given, and then objecting to any further testimony. This court does not look with favor upon objections made, or upon motions to strike, when the objection could have been, but was not, made to the question asked before the answer has been given. The witness continued:

"When he came out of the bank, his left hand had this same shopping bag, and in his right hand he had a Reising automatic rifle.

"Q (by Mr. Lindas) And will you describe what occurred from that point on, now?

"A He started across the street, and when he got to this little island or almost to it, he whirled

and started shooting, and I saw one of our agents fall and as a result of his shots."

Here again objection was made after the testimony had been given. Counsel asserted that the evidence "should be stricken", whereupon the court struck the evidence and instructed the jury to disregard the testimony. We do not mean to intimate that it was either necessary or proper to strike this testimony. Again we quote from the transcript:

"Q * * * Well, will you describe what the defendant did from that point on without referring to any ——
"A (interrupting) The defendant started running and he got over to the west curb line of 82nd Avenue, and he tripped over the curb and fell, and he immediately got up and continued to run and shoot ——
"MR. JACOBS: The same objection.
"Q (by Mr. Lindas) Don't mention the shooting at this time.
"THE COURT: The objection will be sustained. The jury is instructed to disregard it.
"THE WITNESS: He came on down to where his truck was, and he broke into a street in front of the truck ——".

The witness continued as follows:

"A He broke into the street, I mean, as he came out into Foster Road in front of his truck and turned to his left to go back and get into his truck but he was shot down by agents of the F. B. I.
"MR. JACOBS: The same objection, your Honor, and the same motion that a mistrial be granted."

A motion for mistrial was denied, but the jury was again instructed to disregard any testimony of this officer "concerning any shooting."

In the course of this testimony there were several motions for a mistrial, but there was no assignment of error based on these rulings. The only such assignment relates to a motion made at the close of the opening statement by the prosecution. The witness Frank, a special agent of the FBI, saw the defendant enter the bank. In answer to a question by the prosecution, he testified:

"A * * * I followed him and saw him enter the bank, and I started to go in, but just as I pushed the glass door open, I saw a number of people inside, They had their arms raised so I presumed a bank robbery was in progress."

Defense objected and the court instructed the jury to disregard the statement as to what the witness presumed.

The defendant came out of the bank. The officer ordered him to halt, and said, "I am with the F. B. I." We quote:

"Q What happened then, if anything?

"A Well, we both began firing. I fired twice, and he fired a number of shots, I don't know how many. I was struck."

Another belated objection was made and was overruled. The witness then testified that he was shot. Objection was made to the answer and was overruled.

Witness Deaderick testified that at that time, Long was firing a Reising automatic rifle; that officer Frank fell; that Long was wounded and was captured as he attempted to enter the Rucker pickup truck. The rifle, exhibit 33, was identified. It fired a 45 caliber metal-jacketed projectile. Defense counsel stated he had no objection to that evidence. The witness identified the two shopping bags previously mentioned, and testified

that the bag was about half full of money that was taken from the bank. A large amount of ammunition was taken from the truck and was received without objection. The dark glasses which defendant was wearing were offered in evidence and an objection to their admission was sustained for no stated reason. The keys to the pickup truck were in the pocket of defendant Long.

At about 1:45 p. m., and before the body of Rucker had been found, officer Deaderick advised the defendant of his rights and interviewed him. Long stated that he had stolen the truck on the afternoon of the 14th on S. E. 82nd Street. He admitted that he got the guns in the vicinity of 68th and Flavel (the location of the Salzwedel home) and that he cleaned the guns at the trailer court. The witness again interviewed the defendant on the 16th after the discovery of Rucker's body. Defendant told the witness that he got the information about the guns from Everett Pendleton in the penitentiary. The defendant also volunteered the statement that he had fired four or five shots from the Reising automatic rifle "in the woods up in back of Clackamas on the evening of the 14th". At one time the defendant stated that he found the rifle and the 45 automatic in the trunk. At another time he said he found the 45 automatic in the truck which he had stolen. After the witness mentioned the name of Rucker the defendant stated that he did not want to talk any more about the truck.

On cross-examination defense counsel, in referring to the 16th of June, inquired, "The same day of the bank robbery — — the day after the bank robbery?" Answer, "That's right."

Special agent Rice was asked to relate to the jury what statement the defendant made concerning special

agent Frank. The witness answered: "He stated that he knew that he had shot an F. B. I. agent at the time of the bank robbery." Again counsel for the defense made a belated objection to the answer, and again the objection was sustained and the jury was instructed to disregard the statement concerning officer Frank. There is evidence of further statements by the defendant. Among others, he said that there was no one around the pickup truck when he stole it; that he had five dollars when he left the penitentiary; that he had found six to eight dollars in a billfold in a compartment of the truck; and that when he stole the truck it was full of gasoline. All of these statements were contrary to the established evidence and may be considered evidence of guilt. The pickup truck was the property of Walter Rucker. Attached to the car key was a tag on which was written Rucker's name, and in the billfold, found by the officers in the truck, was the name of Walter Rucker, together with his Washington address, but no money. The officers also found a new shirt with a price tag of $6.97; a gun cleaner; much ammunition; and hacksaw blades in the truck. There is evidence that the gun butt found in a trunk at the Salzwedel house had been cut from the shortened Reising rifle used by the defendant.

■ Upon the issues now being examined, it is unnecessary to give any extended review of the evidence concerning the discovery by two children of the body of Walter Rucker in the Eagle Fern Park on 15 June. The children told their mother. The officers were called. The body was repeatedly identified as that of Rucker. Photographs were taken before the body was touched or moved and an autopsy was later performed. The evidence indicated that Rucker was shot from behind with a 45 caliber rifle using a bullet with a metal

jacket. The rifle and the ammunition used by the defendant at the time of his arrest were of that caliber and kind. It was relevant for the state to show the character of the rifle and ammunition in the possession of the defendant at the time of his arrest and the circumstances constituting the res gestae at that time and place.

The only serious questions in this case relate to the admissibility of the evidence concerning the relationship between Long, Pinson and Purnell in the penitentiary, and concerning the theft of the truck; the robbery of the bank, and the shooting of officer Frank, most of which was received before objection was made and was stricken with instructions to disregard, as we have previously shown. The applicability of the evidence concerning these matters was strictly limited by the following instruction which was given by the trial court:

"You are trying this defendant in this case on the charge of first degree murder and upon no other charge and you therefore must confine your attention to the charge of first degree murder as contained in the indictment, or to a lesser crime included therein as herein instructed. Evidence, if any, which may have been introduced showing the defendant's connection with any shooting of a Federal officer should be disregarded, except insofar as it may show, if it does, even knowledge of the crime with which he is here charged. Evidence, if any, which may have been introduced showing the defendant's connection with any bank robbery should be disregarded, except insofar as it might indicate, if it does, a motive for the commission of the crime for which he is on trial in this court. Evidence, if any, which may have been introduced showing the defendant's incarceration in the penitentiary should be disregarded, except insofar as

it may show, if it does, his opportunity for knowledge of the location of any firearms.''

■ We now turn to the law which controls decision as to the issues now under consideration. The general rule is clear. In the trial of a criminal case, evidence concerning other distinct crimes in no way connected with that for which the defendant is on trial, is inadmissible. *State v. Houghton,* 43 Or 125, 71 P 982; *State v. McClard,* 81 Or 510, 160 P 130; *State v. Casey,* 108 Or 386, 213 P 771, 217 P 632. The meaning of the rule should be determined in the light of the generally accepted reason for its existence, which is, that the prosecution should not be permitted to show that the defendant committed other crimes "for the sole purpose of blackening his reputation and thereby rendering it easier for the jury to reach a verdict of guilty." *State v. Bailey,* 179 Or 163, 176, 170 P2d 355. Further reasoning supporting the general rule is found in *State v. Start,* 65 Or 178, 132 P 512.

■ The exceptions to the exclusionary rule are equally well established. Confusion has frequently arisen, however, because this and other courts have at times contented themselves with a statement of the particular exception which is applicable to the case then under consideration, as if that exception were the only one which is recognized. The first general exception to the rule of exclusion might logically have been treated by the courts as a general rule of admissibility to which the exclusionary rules are exceptions. It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application. *State*

*v. Gillis,* 154 Or 232, 236, 59 P2d 679; *State v. Dennis,* supra, 177 Or 73, 124, 159 P2d 838, 161 P2d 670; *State v. Ewing,* 174 Or 487, 497, 149 P2d 765. This court has repeatedly quoted with approval the classic statement of Justice Brewer in *State v. Adams,* 20 Kan 311, 319 as follows:

"* * * A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him. * * *"

■ With equal precision this court has said that a defendant cannot exclude evidence by making his actions criminal where the evidence would be admissible if his act was lawful. *State v. Wye,* 123 Or 595, 604, 263 P 60. Thus it clearly appears that the problem concerning the admissibility of evidence of other offenses is, in its essence, merely a special aspect of the broad general problem of relevancy which is always with us.

■ Another exception to the exclusionary rule which is applicable to the case at bar has been well stated by Underhill as follows:

"If several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them can not be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme. * * * Under this exception to the rule, it is not material that the crimes are dissimilar if they are all parts of one indivisible whole. But no separate and isolated crime can be given in evidence under this exception to the rule. In order that a collateral crime may be relevant as evidence, it must be connected with the crime under investigation as part of a general and composite transaction." Underhill's Criminal Evidence, 4th ed, § 182.

The same author states that:

"The length of time over which evidence of another offense may be admitted is a matter of sound discretion of the court. * * *" § 182.

Again we quote:

"Usually some connection between the crimes must be shown to have existed in fact and in the mind of the accused, uniting them for the accomplishment of a purpose common to both, before such evidence can be received. * * *" Op cit.

From the same author we quote:

"* * * Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; *or tend to corroborate direct evidence admitted*. Thus, the fact that the evidence introduced to prove the motive of the crime for which the accused is on trial points him out as guilty of an independent and totally dissimilar offense is not enough to bring about its rejection, if it is otherwise competent.

"* * * And, generally, if one crime may have been perpetrated for the purpose of aiding in the commission or concealment of another, or to aid the escape of the accused, the incidental crime may be shown as furnishing a motive for the commission of the crime for which the accused has been indicted." 4th ed, § 184. (Italics ours.)

The rule as stated by Wharton is as follows:

"* * * if the other crime and the crime charged are so linked together in point of time or circumstances that one cannot be fully shown without proving the other, regardless of whether the crime incidentally shown is of the same or a different character from the one on trial, the general rule of exclusion does not apply. Any difficulty as to

the admission of evidence which shows, or tends to show, the commission of another crime disappears if the evidence is considered strictly upon the grounds of its relevancy to the issues on trial, provided the evidence of other acts is not used to prove the corpus delicti. * * *" 1 Wharton's Criminal Evidence, 11th ed, § 345.

The rule as stated has received the unqualified approval of this court.

In *State v. Baker,* 23 Or 441, 443, 32 P 161, this court said:

"* * * In cases where the prosecution relies on circumstantial evidence for a conviction, and the evidence offered forms logically one link in the chain of circumstances, tending to show that he who committed the one crime must have committed the other, or is so intermingled and connected with the crime charged as to form one entire transaction, it is admissible although it may tend to prove distinct felonies. * * *"

And see *State v. Weitzel,* 157 Or 334, 69 P2d 958; *State v. Christiansen,* 150 Or 11, 41 P2d 442; *State v. Willson,* 113 Or 450, 464, 230 P 810, 233 P 259.

■ It is universally recognized that:

"'* * * in a prosecution for homicide, evidence of other crimes committed by the defendant which are in time and circumstances so intimately connected with and a part of the crime with which he is being charged as to show a motive for the commission of the homicide or a state of mind indicating a purpose for its commission is admissible to establish such motive or state of mind. The theft of a revolver by the defendant may be shown, in a prosecution for murder of a police officer, as indicating fear of arrest as a motive. To be admissible, however, such evidence must shed some light upon the question of motive and be consistent with the prosecution's theory as to the de-

fendant's reason for killing the deceased.'" *State v. Bailey,* supra, 179 Or 163, 176, 170 P2d 355.

*State v. Henderson,* 182 Or 147, 187, 184 P2d 392; Underhill's Criminal Evidence, 4th ed, § 184; 26 Am Jur, Homicide, § 314, p 367; Wigmore on Evidence, Vol II, § 363 and notes.

In the majority of cases in which evidence of other crimes has been received to show motive, design or purpose, the collateral crimes were committed before the crime for which the defendant was being tried, but the real question is not whether the collateral crimes occur before or after the crime charged. The question is whether the collateral crimes tend to show motive, design or purpose for the crime charged. For this purpose, retrospective evidence may be as pertinent as prospective.

In *State v. Start,* 65 Or 178, 184, 132 P 512, this court quoted from *State v. O'Donnell,* 36 Or 222, 61 P 892, as follows:

"'(3) If the facts and circumstances tend to show that the prisoner committed an independent dissimilar crime, to enable him to perpetrate or to conceal an offense, such evidence is admissible against him upon an indictment charging the auxiliary crime, when the intent to perpetrate or conceal such offense furnished the motive for committing the crime for which he is put upon trial.'"

The court then said at 185:

"* * * Under the third exception an illustration would be where a burglar stole tools from a foundry with which to break the safe burglarized. Evidence of the crime could in such circumstances be given to support an indictment for the other. On the trial for burglary the stealing of the tools could be shown as preparation for the crime charged, and on an indictment for larceny of the

tools the commission of the burglary with them would supply the motive for stealing them. * * *''

The admissibility of evidence tending to show that subsequent to the date of the commission of the crime for which the defendant was on trial, he committed another and different crime, was expressly recognized in *State v. Wilkins*, 72 Or 77, 86, 142 P 589, the admissibility of the subsequent crime being dependent upon its tendency to show a motive for the commission of the crime charged. The court said:

"* * * So in State v. Start, 65 Or. 178 (132 Pac. 512, 46 L. R. A. (N. S.) 266), the principle is recognized and the illustration given that, where a burglar stole tools from a foundry with which to break into the safe burglarized, the commission of the burglary with the tools stolen could be given on the trial of an indictment for the larceny of the tools as supplying the motive for stealing them. * * *''

■ The principle recognized in these cases is applicable in the case at bar. The jury was entitled to consider the evidence of the bank robbery, which, with the other evidence in the case, tended to establish the motive for the car theft and murder which accompanied it. No one can read the transcript of testimony and not be convinced that every act of the defendant, from his release at the door of the penitentiary to the moment of his arrest, was part of a plan, actually carried out, to equip himself with weapons, ammunition, dark glasses, and a get-away car, for the purpose of accomplishing a successful bank robbery. The evidence tended to indicate that the killing of the owner of the car, for the purpose of securing it, was an integral part of the transaction and was motivated by the intention to commit the subsequent robbery.

In *State v. McLennan*, 82 Or 621, 162 P 838, the

defendant was charged with the larceny of horses. Evidence was received tending to show that thereafter the defendant altered the brands and slaughtered the horses, which acts constituted subsequent collateral crimes. The court said:

"* * * All those things might be part of the general plan of the defendant. At least, the jury was entitled to consider them under proper instructions to that end."

The later crimes were admissible because they tended to explain and establish larcenous motive and purpose for the earlier theft and because they constituted evidence of consciousness of guilt. See also *State v. Biggs*, 224 NC 722, 32 SE2d 352; *Wilcox v. State*, 250 Wis 312, 26 NW2d 547; *Kramer v. Commonwealth*, 87 Pa St 299; 1 Wharton's Criminal Evidence, 11th ed, § 532, p 527.

The evidence amply justifies a conclusion that there was a close and immediate connection in the mind of the defendant between the information received from Purnell, the false representations by which he secured the guns and ammunition, the killing of Rucker to get the truck, the bank robbery, and the plan to escape with the loot by the use of the truck, in the course of which he shot the officer. The evidence satisfies the requirement stated by Underhill and approved by this court:

" 'To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish * * *." *State v. Willson*, supra, 113 Or 450, 230 P 810, 233 P 259.

Underhill's Criminal Evidence, 4th ed, § 182. See *State v. Hembree*, 54 Or 463, 103 P 1008; *State v. Walters*, 105 Or 662, 668, 209 P 349; *State v. Sullivan*, 139 Or

640, 11 P2d 1054; *State v. McClard,* supra, 81 Or 510, 160 P 130; *State v. Ewing,* supra, 174 Or 487, 149 P2d 765; *State v. Bailey,* supra, 179 Or 163, 176, 170 P2d 355; *State v. Henderson,* supra, 182 Or 147, 184 P2d 392, 186 P2d 519.

As a final word concerning the admissibility of evidence of other offenses when offered to show motive for the crime charged, we quote from 1 Wigmore on Evidence, 3rd ed, § 216, which received the express approval of this court in *State v. Henderson,* supra:

" 'By every spot of blood with which he taints the steps of his criminal progress, he succeeds in increasing the safety of his new crimes. This is an ample reason, if no other were even conceivable, for refusing to make an exception, already antagonistic to principle and obnoxious to practical procedure. "No man," in the neat phrase of Mr. Justice Brewer, "can by multiplying crimes diminish the volume of testimony against him." * * * That general principle (ante, § 10) is that all facts affording any reasonable inference as to the act charged are relevant and admissible, including facts showing * * * motive, * * *.' "

It must be remembered that this is a case in which proof of guilt rests solely upon circumstantial evidence. As said in *State v. Hembree,* supra, 54 Or 463, 475, 103 P 1008:

" 'It is in cases of proof by circumstantial evidence that the motive often becomes not only material, but controlling, and in such cases the facts from which it may be inferred must be proved. * * *' "

In cases of this kind it is not enough to present merely a prima facie case. If the state must exclude any reasonable hypothesis other than that of guilt and is thus to produce conviction in the minds of the jury,

then the state should have the right to explain and corroborate its testimony and fortify the credibility of witnesses whenever relevant facts are available for that purpose. The defendant now asserts that the evidence of guilt is vague; that there is a total want of evidence of deliberation and premeditation and malice, and that the verdict is insufficient to warrant the conviction. It is not difficult to guess at the nature of the argument which would have been presented here if the court had excluded all of the evidence suggestive of the commission of other crimes by the defendant. If such evidence had been excluded, the case would have assumed the following aspect: The defendant was under constant surveillance by officers. Why? The jury would have had no explanation of this strange circumstance. He secured weapons and ammunition. Why? And how did the officers know about it? The jury would have had no answer, because forsooth, the explanation would have shown that he had been in the penitentiary and therefore had committed a crime at some time. The defendant was driving a pickup truck with a Washington license. How did he get it, and why should the fact have interested the agents of the FBI who were following him? The jury would have had no answer because the explanation would have shown that the defendant stole the truck from the deceased. Can it be assumed that the jury would have believed the extraordinary story told by the officers by which almost every move of the defendant was traced if no reason had been given for the actions by which the facts became known? The fact that the defendant attempted flight when accosted by an officer was one for the consideration of the jury. In view of all of the evidence they were authorized to infer that the consciousness of guilt thus manifested bore

some relation to the death of Rucker. The fact that there were other reasons inducing the defendant to resist arrest tends to weaken rather than to strengthen the inference of the conscious guilt of murder, which inference arose from the evidence of his violent efforts to resist arrest, but that would be a matter for the consideration of the jury. The facts known to the officers at the time of his arrest supplied them with good reason for believing that the defendant had committed one or more felonies for which arrest without a warrant was authorized. We do not understand the defense to attack the legality of the arrest. Can it be said that the court should have excluded the evidence which showed that the officers were within their rights in making the arrest? If the arrest was legal, the evidence growing out of it was admissible. At that time the defendant had in his possession the gun which the evidence tends to identify as the murder weapon. That he was seen carrying the gun is of strong probative force. It is not the fault of the state that when seen he was using it while running out of the bank with a sack full of money and while shooting down an officer. It was not the duty of the state to present the case as if an apparently harmless citizen had been shot down and arrested while crossing the street carrying an innocent shopping bag. The presence of the murder weapon, the stolen car, the empty billfold containing Rucker's name, the car keys, the dark glasses, the ammunition, all were relevant upon the charge of murder. That they also proved other crimes is not the fault of the prosecution.

Under the authorities which we have cited, the evidence which was introduced and which incidentally indicated the commission of other crimes, was relevant. Under the first rule cited, we hold that such

evidence was admissible because it had probative value on the issue of murder. Under the second, it was admissible because the evidence of other crimes was so intertwined with the evidence relative to the murder that the exclusion of the former would have destroyed the convincing effect of the latter. The chain of circumstantial evidence would have been weakened if not broken. Thirdly, and most important of all, the evidence convincingly establishes a single deliberate and premeditated plan covering the entire period of twenty-five hours, culminating in the bank robbery and resulting in the shooting affray. The theft of a car is, unfortunately, a common occurrence. It is not often accompanied by murder. Only a desperate urgency would make probable the commission of a murder in order to secure a car. Evidence of that urgency was furnished by the plan to rob a bank, using an out-of-state pickup truck as the means of escape. The plan furnished the motive for the murder and there was in the mind of the defendant an obvious connection between the different criminal acts.

■ We have treated as true the evidence which we have reviewed, because no witness was called to contradict any portion of it, but in so treating the evidence, we are not assuming to act after the manner of jurors, but only to indicate our opinion that there was competent evidence upon which the jury was justified in reaching its verdict. *State v. Jones,* 179 Or 636, 173 P2d 960.

The defendant cites *State v. Smith,* 55 Or 408, 106 P 797. In that case it was held that error was committed in receiving evidence of other crimes, but upon appeal this court said:

"* * * Nor were such crimes connected in any manner by time, place, or circumstance with the

destruction by fire of the building in question; and, such being the case, we do not think that the rule announced in Kramer v. Commonwealth, 87 Pa. 299, can have any application herein.''

 The rules concerning the admissibility of evidence of other crimes are firmly established in this jurisdiction, and we find no Oregon decision inconsistent with our conclusions on this issue. Since we have held that no error was committed in admitting evidence that the defendant had been an inmate of the penitentiary, we also hold that the rights of the defendant were not prejudiced by the comments of the district attorney on the same subject. The comments of the district attorney concerning the bank robbery were not prejudicial for the same reason.

██ The shooting of the agent of the FBI was so intimately connected in time, place, and circumstance, with the evidence of the robbery and the arrest that it could not have properly been excluded. It was part of the res gestae within the true meaning of that phrase. Furthermore, in view of the fact that the defendant was shot while attempting to escape, the state was entitled to show why such extreme action was necessary to accomplish the arrest.

██ The comment of the prosecutor concerning the security of citizens in their homes by reason of the protection afforded by the FBI apprehending notorious criminals did not constitute reversible error. The court cautioned the jury that any reference to any other crimes or criminals had no reference to the defendant. In concluding the discussion of this issue we deem it significant to quote from the defendant's brief:

"It was possibly necessary to show that the FBI Agents were following LONG and why to avoid confusing the jury, and it is conceded that this

evidence was first brought out on cross examination without objection on the part of defense counsel. * * *''

The next assignments of error relate to the admission into evidence of a Transparency Kodachrome of the decedent's head which was projected upon a screen. Three such pictures were offered. Only one was received in connection with the testimony of Dr. Richardson, a medical expert who took the picture. The qualifications of Dr. Richardson were established and were impressive. He has served as director of the crime laboratory for the Oregon State Police, as assistant professor of pathology, and has had wide experience in connection with autopsies and in the study of violent death as a result of extended experience in the second World War. The picture was taken, said the witness:

"* * * to demonstrate this area behind the left ear, the nature of the hair, the nature of the burned area about the entrance of the wound, and the study, and the study for myself at a later date of any particles of debris that might be about this wound.''

The witness affirmed that the picture was a true and correct representation and was ''an excellent picture.'' The witness, using the picture to illustrate his testimony, said:

"A * * * The wound is here in this area (indicating). It is circumscribed, and what I wanted to point out is this dark area about the wound here, this area which is the charred or burned fragment of the flesh. Especially in here can the burned area be seen, and that this entered in that manner, splattering and making a uniform entrance through the hair. Careful study of the area about it and outside of the burn does not reveal any black pitting, does not reveal any black debris about it, does not reveal any material that can be scraped

from there and any material which chemically demonstrates nitrates or nitrites. That entire wound was cut out and taken back and extracted for powder and powder debris and none was about it, so no powder debris was about this wound.

"Q And that would mean what, Doctor, with respect to the entrance of the projectile?

"A The distance of this particular weapon, for instance; this gun was fired at a distance that the powder could not be dispersed or make impressions about the wound."

██ The witness also testified that the bullet had to be of a very hard-jacketed variety and that the hole corresponded "in the range of the so-called 45 caliber bullets." The pictures were relevant for the purpose of showing the extent of bleeding at the entrance and exit wounds respectively. Bleeding was chiefly from the wound in front of the right ear, tending to indicate that the deceased was shot from behind, the bullet entering behind the left ear. The absence of any evidence of powder in the wound tends to indicate that the shot could not have been fired by the deceased. As we have said, the prosecution had the burden of excluding any reasonable hypothesis other than that of guilt. The photographs and the real evidence offered tended to negative accident, suicide or self-defense. The pictures were admissible for the purpose of explaining and demonstrating the testimony of the medical expert. *State v. Casey,* supra, 108 Or 386, 213 P 771, 217 P 632; *State v. Nelson,* 162 Or 430, 92 P2d 182; *State v. Cunningham,* 173 Or 25, 144 P2d 303. Photographs showing the position of the body when found by the officers were also admissible as explaining and supplementing the testimony of the witnesses. *State v. Dennis,* supra, 177 Or 73, 159 P2d 838, 161 P2d 670. *State v. Henderson,* supra, 182 Or

147, 184 P 392, 186 P2d 519. *State v. Garver,* 190 Or 291, 225 P2d 771; *State v. Leland,* 190 Or 598, 227 P2d 785.

The persistent assertion in criminal cases that the jury should not be permitted the benefit of relevant evidence because it is thought to be "gruesome" constitutes, in effect, an attack upon the entire jury system. If a jury is incapable of performing its function without being improperly influenced by evidence having probative force, then the jury system is a failure. It is not a failure. Long experience convinces us of the ability and willingness of citizens called for jury duty to perform that duty with fidelity.

It is next contended that:

"The Court erred in permitting an expert witness to give an opinion as to the mental state of the decedent at the time of his death and as to whether the decedent was moving before or after death."

The expert did not state an opinion as to the mental condition of the decedent. He made a thorough autopsy and followed the course of the bullet through the head of the deceased. He testified that the bullet completely severed the medulla oblongata; that rigor mortis immediately set in and that "he never moved again." We quote:

"Q Doctor, are there various types, do you know, of rigor mortis?
"A Yes.

"Q Could you classify this type of rigor mortis that you saw on this body?
"A Well, this is the similar type which I have had experience with. I have seen in battle casualties, or where a man is in sudden fright and running in action or moving in action with sudden fright.

"Q And you would say that type of rigor mortis would indicate then a sudden fear of death?
"A Yes, or excitement."

■ Objection was made to the receipt in evidence of the shoes and clothing of the deceased. On one shoe blood spots appeared. On the other there was nothing of significance. Its receipt could not have been prejudicial nor did the court err in receiving the other articles of clothing. The defendant moved for a new trial on account of alleged errors, but did not move for a directed verdict. In this case he has attempted to raise the questions which could have been presented by a motion for directed verdict. Under these circumstances, the motion for a new trial was not a permissible procedure for raising the question as to the sufficiency of the evidence. *State v. Leonard,* 73 Or 451, 144 P 113, 144 P 681; *State v. Evans,* 98 Or 214, 192 P 1062, 193 P 927; *State v. Sing,* 114 Or 267, 229 P 921.

■ This being a capital case, the court has gone through the evidence in minute detail, notwithstanding the defective procedure by which the issues were raised. We conclude that there was sufficient evidence to go to the jury on every issue raised by the indictment, and that no prejudicial error was committed.

The judgment of the circuit court is affirmed.