Argued and submitted November 12, 1981, reversed and remanded
for a new trial April 26, reconsideration denied June 10,
petition for review denied July 7, 1982 (293 Or 373)

# STATE OF OREGON,
*Respondent,*

*v.*

# DENNIS RICHARD BROOKS,
*Appellant.*

## (No. 80-4-225, CA A20739)

643 P2d 1324

John Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, Joseph, Chief Judge, and Roberts, Judge Pro Tempore.

GILLETTE, P. J.

### GILLETTE, P. J.

This is a criminal case in which defendant was convicted after trial by jury of the murder of a woman named Kitty Coy. He was originally sentenced to death but, after the Supreme Court's decision in *State v. Quinn,* 290 Or 383, 623 P2d 630 (1981), he was resentenced to life imprisonment with a 25-year minimum term. He appeals, assigning as error (1) the trial court's admission of certain "other crimes" evidence, (2) denial of a mistrial concerning such evidence, (3) admission of certain "gruesome" photographs, (4) denial of a mistrial on the basis of a witness' self-serving claim to have passed three lie detector tests and (5) his sentence. We reverse and remand.

### FACTS [1]

On September 16, 1979, defendant and a man named Fred Hazeem drove from Portland to Chico, California, to see a friend. On arriving and finding the friend was in a local jail, the men met a friend of Hazeem's, Jan Leonard, and her roommate, Kitty Coy. Because Coy was involved in numerous credit card forgeries and wanted to leave Chico as soon as possible, the women agreed to accompany the men back to Oregon.

While driving back to Oregon, Coy suggested stopping at John Burk's residence in Red Bluff, California, where the women entered and stole certain weapons:

1. a Ruger .22 caliber bearcat pistol and holster;

2. a Winchester .25-.35 lever action rifle;

3. a Winchester model 94 .30-.30 rifle;

4. a Western .22 single-shot rifle;

5. a black powder Navy .36 caliber reproduction;

6. a Stevens 16-gauge shotgun; and

7. a Hawkins reproduction .45 caliber rifle.

Hazeem testified that defendant kept the .22 caliber pistol. On September 20, 1979, Hazeem, posing as "William

---

[1] We take our statement of the facts in substantial part from that in the defendant's brief, to which the state has taken no material exception.

Sowve," sold three of the rifles stolen from Burk to Maury's Gun Rack for $120.[2] According to Hazeem, the women were given shares of the proceeds, and defendant "probably" received a share.

On arriving in Portland, the women stayed at Hazeem's residence; defendant stayed elsewhere. For the first few days, Hazeem showed the women around Portland and the Cascade mountains. Because Coy needed money, the two women and Hazeem engaged in a series of thefts and derivative forgeries. Hazeem described their *modus operandi:*

> "* * * Well, like they would go inside of a store and I would be with one of the girls and distract a shopper and the other girl would take her wallet out of her purse or take her whole purse altogether. There was a Visa card in the purse and the person's checkbook, take a person's check and cash them at Fred Meyer's up to $50 with the Visa card, and sometimes a driver's license they might ask for. Or else they could buy merchandise with the credit card or cash payroll checks with the, whatever. Have a number of different things."

He estimated they made $1,000 to $1,200 per day with these schemes. Both Hazeem and Jan Leonard testified that defendant was involved in some of these activities. Hazeem added that he gave some of the derived proceeds to defendant but generally split the proceeds only among the women and himself.

On September 24, 1979, Coy was arrested for forgery, but Leonard posted her bail on the same day. On an unspecified date, Coy stole $40 from Mark Sampson (Hazeem's roommate) while Sampson was taking a shower. Upon checking his wallet, Sampson became infuriated. Hazeem recovered the money from Coy, expelled the women from his house and dropped them off at a motel.

---

[2] The theft occurred around September 17, 1979. At trial, the state did not introduce the pistol. It did introduce rifles 2, 3 and 4 for identification by Steve Nelson, the owner of Maury's Gun Rack, the store where the guns had been sold, and by John Burk. Burk was only able to identify rifle No. 4, and it was introduced over defendant's objection. Also, Burk identified the pistol holster. Hazeem asserted that defendant used the Ruger .22 caliber pistol as the murder weapon.

On September 26, 1979, Leonard was arrested at her motel room for forgery and possession of a controlled substance. The forgery arose from her use of a credit card she had stolen while accompanied by Coy and Hazeem; defendant had not been present. Leonard was in jail for three days before Hazeem posted $175 for her security release. She caught the first bus to Chico on the morning after her release.

On October 6, 1979, at 5 p.m., two men and a woman stole Zetta Medford's purse while she was shopping at a Safeway store. Medford identified defendant and, from a photograph, Coy as two of the participants. On October 7, 1979, between 11 a.m. and 12:30 p.m., defendant and Hazeem picked up Coy at her motel room and went out to eat. They paid for the meal with a stolen credit card. According to Hazeem, the three then performed a "couple dozen" thefts. At a Fred Meyer store, while the sales clerk checked on Coy's proffered credit card, defendant took a cigarette lighter and left without paying, followed by the others. Hazeem testified that LSD was procured at Hazeem's brother's house and that defendant put it in Coy's chili when they stopped at a restaurant.

Next, Hazeem advised Coy they were going to a convention at a place in Estacada where she should "pick up some guy and steal his credit card," thereby enabling them to use a stolen card bearing a male's name. While driving to the Mt. Hood National Forest, the three consumed beer, marijuana and nitrous oxide (laughing gas).

Along a logging road in the High Rocks area, defendant asked the driver, Hazeem, to stop. He walked into the trees, returned and ordered Coy out of the car. Although she appeared nervous, Hazeem coaxed her out by suggesting that everything would be okay if she cooperated. All three then walked to a tree 50 feet from the road, where Hazeem thumbcuffed Coy to a tree.

Hazeem testified the men walked back to the car. Defendant then took the .22 caliber pistol from his belt and *walked back to the tree. Hazeem heard three or four* gunshots. Defendant returned to the car slightly out of breath, looking proud, and told Hazeem that he told Coy, "You shouldn't rip off people you scheme with."

The men left the area. While Hazeem drove, defendant wiped off fingerprints and threw out many of the victim's possessions along the road. He also threw out the firing pin and chamber of the pistol along the road and the remaining portion of the pistol into a pond. Although the pond was thoroughly searched later, the pistol was never found. Between 6 and 6:30 p.m., the two men arrived at Hazeem's house, where defendant told Mark Sampson that Kitty Coy was gone, and they checked her remaining possessions to guard against incriminating evidence.

Defendant and Hazeem drove to Reno for a few days. On returning on October 10, 1979, Hazeem suggested that they burn the credit cards that Coy had used, and defendant did so. On October 11, 1979, police executed a search warrant at Hazeem's residence, in a fraud investigation, and seized two .22 caliber rifles and a .22 caliber pistol.[3]

Later in the month, Hazeem and defendant returned to the crime scene, where Hazeem reclaimed his thumbcuffs and took the deceased's ring. He gave the ring to Jill Walker, his girlfriend. Two days later, defendant, Hazeem, Walker and two others drove to Seattle and flew to Alaska. In Alaska, Hazeem sent Walker home, because she made a phone call to someone in Oregon and he feared his whereabouts could be traced. A few days later, defendant and Hazeem had an argument over a debt and they parted company.

On November 12, 1979, Hazeem was arrested on an unrelated charge in Wyoming. He waived extradition and was returned to Oregon on forgery charges. On December 4, 1979, he took officers and a search dog to the snow-covered crime scene, where they found the victim. Investigators noted that the deceased's lower teeth were missing,[4] and her thumbs were severely cut.

---

[3] In the present trial, the seized rifles were received as evidence over defendant's objection as to relevance.

[4] Hazeem testified at trial that he and defendant had a conversation in the exercise yard at the Oregon State Penitentiary in which defendant said he had returned to the scene, taken the deceased's teeth as a souvenir and recovered the pistol from the pond after he heard Hazeem was talking with Detective Peterson.

On December 6, 1979, Doctors Brady and Lewman performed an autopsy. At trial, Lewman described the steps of the examination and relied on a series of color photographs of the partially decomposed corpse to illustrate his remarks. Lewman concluded that the cause of death was gunshot wounds to the head and brain.

At the autopsy, Trooper Chris Johnson, a criminalist, took blood, hair and clothing samples and the bullets removed from the deceased's skull. He found that they were .22 caliber bullets. On December 14, 1979, Johnson test-fired the weapons seized from Hazeem. Because each of those weapons—like a normal Ruger .22 caliber pistol—emitted bullets having six lands and grooves with right-hand twist, he concluded that any of the weapons could have been the murder weapon.

On January 2, 1980, defendant was arrested in Vancouver, Washington, and taken to the Clark County Jail. In two interviews with a detective and after advice of *Miranda* rights, defendant told the detective that he had received only the lighter as proceeds of the credit card thefts. He conceded that he frequently carried thumbcuffs or handcuffs, stated he had possession of the .22 caliber pistol stolen from Burk only during the trip from Chico to Portland and identified the various motels where Coy had stayed. On January 29, 1980, officers searched defendant's residence pursuant to a warrant and seized an ammunition belt and the pistol holster which had been stolen from Burk.

Defendant took the stand in his own behalf. His story corroborated much of Hazeem's detailed account, with the important exception that defendant said Hazeem, not he, shot Coy. On cross-examination, defendant reiterated that Hazeem had thumbcuffed the victim to the tree. He conceded that he threw out some of the victim's possessions during the ride back. He admitted that he kept possession of the .22 pistol from Red Bluff to Portland but denied having it thereafter. He stated that he usually carried a .45 caliber automatic pistol in his boot, and maintained that the seized holster belonged to him and not to John Burk.

## EVIDENCE OF "OTHER CRIMES"

Defendant first argues that the trial court erred in denying his numerous motions to exclude evidence of other crimes and his motions for mistrial in connection with such evidence. The standard for review of challenged "other crimes" evidence is set forth in *State v. Hockings,* 29 Or App 139, 144-45, 562 P2d 587, *rev den* (1977):

"When approaching the question of admissibility of 'other crimes' evidence courts often state as a rule that this evidence is inadmissible unless it comes under one of the many exceptions to that particular exclusionary rule. To state such a general rule masks the complete progression of analysis in determining admissibility. It is more proper to first determine if the proffered evidence is relevant, without regard to its character, and then determine if there is some recognized exclusionary rule in the law of evidence which would nevertheless keep it out. The so called rule and its supposed exceptions are merely means of analyzing the relevance of the proffered evidence. It thus appears the rules and exceptions regarding other crime evidence are merely special aspects of the broad general problem of relevancy courts constantly face. *State of Oregon v. Long,* 195 Or 81, 244 P2d 1033 (1952). If the state establishes the evidence is relevant, the defendant must establish that it has prejudicial impact which outweighs the probative value that inheres in relevant evidence. *See State v. Manrique,* [271 Or 201, 531 P2d 239 (1975)]; *State v. Zimmerlee,* 261 Or 49, 492 P2d 795 (1972); *State v. Harrison,* 253 Or 489, 455 P2d 613 (1969); *Trook v. Sagert,* 171 Or 680, 138 P2d 900 (1943). As the Supreme Court stated in *State v. Manrique:*

'The fundamental rule of evidence is that in order to be admissible evidence must be relevant, *i.e.,* have some probative value to prove some issue in a case, and that all relevant evidence is admissible unless it falls within one of the so-called "exclusionary" rules of evidence. * * *. 271 Or at 205.'

"It may be noted the evidence must be relevant to establish some fact or inference the state is entitled to prove. For example, the state is not entitled to show the defendant has a propensity to commit a crime because he has been involved in other criminal activity or that he probably committed the crime because he is a person of general bad character. But the fact the evidence may tend to show these characteristics does not make it inadmissible if the

evidence is also relevant and probative of some fact the state is entitled to show. The issue then becomes whether the probative value incorporated in legitimate relevancy exceeds the inflamatory nature of the other inferences the evidence may disclose."

In the present case, the state attempted to prove that on October 7, 1979, defendant intentionally murdered Coy by shooting her. Accomplice Hazeem testified that he and defendant took Coy to the High Rocks area in Clackamas County where Hazeem thumbcuffed her to a tree, and defendant shot her three or four times with a .22 caliber pistol. The prosecutor argued, *inter alia*, that it was necessary to offer other-crimes evidence to corroborate "as much as possible" the accomplice's testimony, ORS 136.440(1),[5] and to complete the picture of defendant's activities leading up to the commission of the crime. On appeal, the state abandons that approach and, instead, urges that the evidence was admissible "for its tendency to complete the story of the crime on trial and to show a motive for the killing."

Defendant contends that the indiscriminate intro-duction of other crimes evidence spanning a three-week period preceding the crime was overbroad and that the cummulative prejudicial impact far exceeded any relevance.

The challenged "other-crimes" evidence involves:

(1) testimony about the theft and resale of stolen weapons and the introduction of these weapons into evi-dence; and

(2) testimony about a series of credit card thefts and forgeries between September 21, and October 7, 1979.

A. *Theft of unrelated weapons:*

■ ■ The prosecutor argued that testimony about the theft and resale of all of the weapons and the admission of

[5] ORS 136.440(1) provides:

"(1) A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission."

the unrelated rifles into evidence was necessary "to account for the origin of the [handgun] and subsequently finding of the holster for the gun" in defendant's house. Defendant urges that admission of the evidence concerning these other weapons was error, citing *State v. Hall,* 36 Or App 133, 583 P2d 587 (1978), and *State v. Cox,* 37 Or App 139, 586 P2d 390 (1978), *rev den* 285 Or 1 (1979).

The evidence was admissible. Hazeem's testimony, if believed, established that defendant killed Coy with a certain handgun. Proof that, prior to the murder, defendant was in possession of other guns which were stolen at the same time as the putative murder weapon strongly corroborated Hazeem's testimony and went far toward showing defendant's opportunity to commit the crime. Both *Hall* and *Cox* involved situations where the proof was of possession of guns which were not themselves related to the offense at issue *and which did not tend to connect defendant with the crime in some other way.* This latter element, missing in those cases, is present here. The guns were properly admitted.[6]

B. *Credit card thefts and forgeries:*

Hazeem and Leonard testified about the series of credit card theft and forgeries committed by defendant, Hazeem, Leonard and Coy. Motel owners verified the dates on which the credit cards were used for lodging. Zetta Medford testified that defendant, another man and Coy stole her purse at a Safeway store on October 6, 1979. With respect to the murder date of October 7, 1979, (1) salesclerk Martha Washburn indicated that defendant, Hazeem and Coy purchased meals with a stolen credit card; (2) Hazeem indicated that the three performed a "couple dozen thefts"; and (3) salesclerk Sherie Favre confirmed that defendant stole a cigarette lighter while Coy proffered a fraudulent credit card for a purchase. Defendant argues that the cumulative impact of describing this "crime spree" clearly portrayed defendant as having a bad character. He urges that such an unrestrained introduction of collateral "background information" goes too far. We agree.

---

[6] Defendant also alludes to, but does not specifically assign as error, the admission of three .22 rifles taken from *Hazeem's* house. The rifles should have been excluded, *see State v. Hall, supra,* but we see no likelihood of prejudice resulting from this erroneous ruling.

■ ■   Background information which describes other criminal activity may be admissible under narrow circumstances where the evidence is not remoté and tends to place a defendant in the vicinity of the crime scene near the time of the crime. *Cf. State v. Hockings, supra* (attempted purchase of marijuana while present at a party within two hours of murder). However, the evidence of events occurring *before* October 7, 1979, was remote, and lacked sufficient probative value, while at the same time it painted defendant as a bad man who stole for a living. It was improperly admitted. *See State v. Manrique, supra.* As in *State v. Quick,* 49 Or App 555, 619 P2d 1347 (1980), where testimony concerned defendant's admission of intent, to take LSD prior to a kidnapping but there was no evidence that he actually took it, the evidence here was not necessary "to complete the picture of defendant's activities leading up to the commission of the crime." 49 Or App at 558-59.

■   The state specifically urges that defendant's statement at the time he shot Coy; "You shouldn't rip off people you scheme with," sufficiently connects the prior crime spree with Coy's death to make all the evidence admissible. Apparently, the theory is that the *motive* for killing Coy was that she had stolen from people she had "schemed" with and the state is entitled to show that motive by showing (a) that Coy "schemed" (*i.e.,* stole) with defendant and others, (b) stole from one of the others and (c) was shot for it. It may be that such a slender thread could serve to tie in all this evidence under certain circumstances. It will not serve here, however, because the state has pointed to no evidence to show Coy stole from defendant, Hazeem or Leonard, *i.e.,* those she had "schemed with." Instead, the evidence is only that Coy stole from Hazeem's roommate— a man who was not part of the scheme. Neither the state's theory on trial—corroboration—nor its theory on appeal— motive—will wash.

■   We agree with defendant that the cumulative prejudicial impact from this evidence of remote and unrelated crimes occurring prior to the date of the murder necessarily tainted and increased the prejudicial impact of evidence of the thefts committed on October 7, 1979—the day of the

murder. Placing defendant in the company of the victim through eyewitness testimony was sufficient corroboration. The supplemental description of the collateral criminal activity resulted in prejudice outweighing any probative value. Admission of that evidence was error requiring reversal. *State v. Manrique, supra.*

■      Given the disposition we make of this appeal on the "other-crimes" question, we note here only one other question raised on appeal, and this only because it may arise on retrial. Defendant assigns error to admission of certain *post mortem* photographs as too gruesome. They are gruesome, but the state's explanation at trial as to why they were necessary was sufficiently convincing that we cannot say that the trial court abused its discretion in admitting them.

Reversed and remanded for a new trial.